## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| QVC, INC., : | |
|      Plaintiff, : | CIVIL ACTION |
|      v. : | |
| STACEY SCHIEFFELIN, DAVID : | No. 06-cv-4231 |
| SCHIEFFELIN and MODELS PREFER, : | |
| LTD., : | |
|      Defendants. : | The Honorable Thomas N. O'Neill, Jr. |
| : | |

## MOTION TO DISMISS AMENDED COMPLAINT AND TO STRIKE
## PARAGRAPHS OF AMENDED COMPLAINT FOR VIOLATION OF FRE 408

AND NOW, come Defendants Stacey Schieffelin, David Schieffelin and Models Prefer,

Ltd. (collectively, "Defendants"), by and through their undersigned counsel, Buchanan Ingersoll

& Rooney PC, and for the reasons stated in the Memorandum of Law filed concurrently with this

Motion, hereby move to dismiss the Amended Complaint and to strike paragraphs of the

Amended Complaint for violation of FRE 408.

In support of this Motion, Defendants submit true and correct copies of the following

exhibits, which are attached hereto:

1.     Letter dated September 12, 2006 from Sharon Blinkoff to Larry Hayes, referenced

in paragraph 23 of the Amended Complaint;

2.     Agreement dated April 1, 1998 by and between David and Stacey Schieffelin and

QVC, Inc., referenced in paragraph 10 of the Amended Complaint (and thereafter); and

3.     The Amended Complaint with all allegations referring to or setting forth

compromise discussions or statements made during compromise discussions redacted pursuant to

Rule 408 of the Federal Rules of Evidence.

WHEREFORE, Defendants respectfully request that the Court enter an order dismissing the Amended Complaint in its entirety or, alternatively, striking the following paragraphs of the Amended Complaint, all of which are in violation of FRE 408: 23, 24, 25, 26, 27, 30, 33, 34, 37, 42, 47, 48, 51, 52, and 54. A proposed order is attached.

Dated: November 17, 2006                BUCHANAN INGERSOLL & ROONEY PC

By: /s/ Antoinette R. Stone (3519)
    Antoinette R. Stone (Pa. I.D. No. 23464)
    1835 Market Street, 14th Floor
    Philadelphia, PA  19103
    (215) 665-8700

*Attorneys for Defendants Stacey Schieffelin,*
*David Schieffelin and Models Prefer, Ltd.*

2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Motion to Dismiss Amended Complaint and to Strike Paragraphs of Amended Complaint for Violation of FRE 408** has been filed electronically and is available for viewing and downloading on the Electronic Case Filing System of the United States District Court for the District of Pennsylvania. I further certify that I am causing a true and correct copy of this document to be on served on this 17th day of November, 2006 by first class United States mail, postage prepaid, upon the following counsel of record for Plaintiff:

> Nathaniel Metz, Esquire
> Saul Ewing LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA  19102-2186

/s/ Antoinette R. Stone (3519)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| QVC, INC., | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| STACEY SCHIEFFELIN, DAVID | : | No. 06-cv-4231 |
| SCHIEFFELIN and MODELS PREFER, | : | |
| LTD., | : | |
| Defendants. | : | The Honorable Thomas N. O'Neill, Jr. |
| | : | |

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS AMENDED COMPLAINT AND TO STRIKE
PARAGRAPHS OF AMENDED COMPLAINT FOR VIOLATION OF FRE 408**

**INTRODUCTION**

QVC, Inc.'s ("QVC") Amended Complaint represents an attempt to leverage a better business deal from the Defendants. For quite some time, QVC (and its alleged affiliate QVC UK) have been discussing the terms under which the relationship between the Schieffelins and QVC UK could prosper. During these discussions, which necessarily involved negotiation of how the current contract would be affected by any enhancement of the relationship with QVC UK, counsel for the Schieffelins and Models Prefer Ltd. sent QVC a letter, at QVC's request. This letter outlined how the existing contract with QVC would need to be terminated and related issues resolved in order for the Defendants to move forward with and execute the contract that had been proposed by QVC UK.

Rather than use this letter, as it was intended, for purposes of compromise and settlement discussions among QVC, QVC UK, the Schieffelins and Models Prefer, Ltd., QVC decided to leverage its position in those discussions by commencing a lawsuit and using the settlement proposal to claim breach of contract. In the Amended Complaint, QVC refers directly to this

letter, relies exclusively upon this letter for its "factual" allegations of purported breach, and

improperly uses these allegations relating to settlement discussions to seek declaratory relief.

QVC's Amended Complaint should be dismissed for at least the following reasons:

1.    QVC has not pled an existing case or controversy to support its request for declaratory or other relief.  Indeed, the very letter upon which QVC's claims are based expressly conditions any future action upon "amicable" termination of the existing Agreement and an expression by QVC that the terms proposed are "acceptable" to QVC.

2.    The September 12 letter constituted a settlement offer, was clearly marked as such, and pursuant to Federal Rule of Evidence 408 cannot be relied upon to prove QVC's claims.  When all allegations arising from this letter either are stricken from the Amended Complaint or are disregarded for purposes of this Motion, there is no basis upon which QVC has stated or can state a claim for relief.

3.    QVC cannot state a cognizable claim for breach of contract or any other cause of action based upon contract principles against Defendant Models Prefer Ltd. because Models Prefer Ltd. is not, and never has been, a party to the contract alleged.

Each of these arguments is set forth in greater detail below.

## DISMISSAL STANDARDS

## I.    DISMISSAL PURSUANT TO RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION

"Whenever it appears by suggestion of the parties or otherwise that the court lacks

jurisdiction of the subject matter, the court shall dismiss the action."  Fed. R. Civ. Proc. 12(h)(3).

When the plaintiff has failed to plead a "case or controversy," the court is constitutionally

forbidden from exercising subject matter jurisdiction over the claims asserted.  U.S. Const. art.

III, § 2; *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153 (3d Cir. 1995).

## II.    DISMISSAL PURSUANT TO RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint should be dismissed if, "after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc*, 140 F.3d 478, 483 (3d Cir. 1998) (internal citation omitted) (affirming dismissal of claims). However, in deciding a motion to dismiss, the court should not assume that the plaintiff can prove facts that it has not alleged, *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 n. 13 (3d Cir. 1998), nor should the court credit a plaintiff's "bald assertions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," "sweeping legal conclusions cast in the form of factual allegations," or "legal conclusions masquerading as factual conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906, 906 n.8 (3d Cir. 1997) (affirming dismissal of complaint for failure to state a claim as a matter of law).

## ARGUMENT

## I.    THIS COURT SHOULD DISMISS THE AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE IT DOES NOT PRESENT AN ACTUAL CASE OR CONTROVERSY AS CONSTITUTIONALLY REQUIRED

Before a court may exercise subject matter jurisdiction over a claim, a "case or controversy" must exist. U.S. Const. art. III, § 2. Although the Constitution requires that a "case or controversy" be pled in any type of claim, this requirement becomes more acute in the context of a request for declaratory relief. *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153-54 (3d Cir. 1995).

QVC's Amended Complaint is, at its core, a request for declaratory judgment. All subsequent counts flow from the assumption that the factual and legal basis for the declaratory relief QVC seeks is sound and, therefore, damages will accrue between the filing of the Amended Complaint and the entry of declaratory relief. As explained below, QVC has not alleged an actual case or controversy sufficient to meet the constitutional requirement for this Court to have subject matter jurisdiction. Accordingly, the Amended Complaint should be dismissed.

### A.    A Live Dispute Must Exist and the Claims Must Be Ripe Before the Constitutional "Case or Controversy" Requirement Can Be Met

"Before a federal court may grant a declaratory judgment, there must be a live dispute between the parties." *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1170 (3d Cir. 1987) (affirming dismissal of action because it was "purely a matter of conjecture whether the defendants [had] threatened to file suit on the theory on which the plaintiff has requested a declaration" and, therefore, the "dispute lack[ed] the immediacy and reality necessary to require a judicial declaration of rights"). The constitutional "case or controversy" requirement "stands as a direct prohibition on the issuance of advisory opinions," and the Declaratory Judgment Act "cannot relax that constitutional requirement." *Travelers Ins.*, 72 F.3d at 1153 (internal citation omitted).

A claim also must be ripe before a court may consider the claim. *Id.* Ripeness prevents federal courts "through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* (internal citation omitted). The question of ripeness also is grounded in the case or controversy constitutional requirement. *Id.*

"The fundamental test is whether the plaintiff seeks merely advice or whether a real question of conflicting legal interests is presented for judicial determination." *Zimmerman*, 834

F.2d at 1170. The Third Circuit has noted that, in order to meet the case or controversy requirement, an action must present at least the following: "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution." *Travelers Ins*, 72 F.3d at 1154 (internal citation omitted). Similarly, when inquiring whether a claim is ripe, the courts examine the adversity of interests, the conclusiveness of relief, and the utility of action. *Id.* at 1154-55.

### B.    QVC's Amended Complaint Does Not State a Case or Controversy

Here, QVC seeks a declaratory judgment where no justiciable controversy exists. First, QVC has not pled adversity of interests as legally defined. Second, QVC's Amended Complaint seeks only an advisory opinion based upon what the law would be under a hypothetical set of facts. Third, declaratory judgment on the issues asserted by QVC is not of practical help to the parties but would serve only QVC's interest in leveraging a more favorable business deal. This is not a proper purpose for court intervention. Accordingly, the Amended Complaint should be dismissed for lack of subject matter jurisdiction.

### 1.    The Parties' Interests Are Not Adverse

Parties' interests are adverse only when harm is certain to result to one or the other if judgment is not entered. If a contingency exists that must be resolved before either party may be harmed, then the parties' interests are not adverse. *Travelers Ins*, 72 F.3d at 1154; *Kiser v Johnson*, 404 F. Supp. 879 (M.D. Pa. 1975) ("If there exist contingencies that must occur before an issue is actually joined by the parties, then the case will not be ripe until those contingencies occur.").

QVC's Amended Complaint alleges that Defendants "have refused to further perform under the Agreement," "have stated their intention to promote and endorse the Products by

5

means of Electronic Media in violation of the non-competition provisions of the Agreement,"
have refused "to make any Appearances on Plaintiff's Programs" or similar variations on these
themes. (Cmpl. ¶¶ 23-24.) These allegations are derived from statements made in a letter dated
September 12, 2006.[1] (Cmpl. ¶ 23; Ex. 1.)

However, that letter demonstrates that the alleged actions QVC fears the Defendants may
take are contingent upon the occurrence of certain events. For example, the compromise terms
proposed in that letter are contingent upon "an amicable termination with QVC US." (Ex. 1 at
2.) The letter also states that the very future conduct QVC alleges as "breaches" in its Amended
Complaint are dependent upon the compromise terms set forth in that letter being acceptable to
QVC. (Ex. 1 at 2.)

QVC does not allege that any of the contingencies or conditions precedent has come to
pass. Of course, if the contingencies ever are fulfilled, then there will be no need for this lawsuit
because the issues will have been resolved amicably to both QVC's and the Defendants'
satisfaction. Accordingly, the parties are not legally adverse as to the claims asserted by QVC in
its Amended Complaint.

### 2.    The Amended Complaint Seeks an Advisory Opinion

Conclusiveness of judgment also is required before declaratory relief can be entered.
Otherwise, a court is simply being asked for an improper advisory opinion. In addition to the
contingencies explained above, this Court does not yet have a concrete set of facts upon which a
judgment lawfully may be based. Accordingly, any judgment would not be conclusive.
*Travelers Ins* , 72 F.3d at 1155 (holding a declaratory judgment must be distinguished from "an
opinion advising what the law would be upon a hypothetical set of facts" and an "integral part of

---

[1] For the reasons stated below, QVC is not permitted to rely upon the September 12 letter to
make its allegations or to support its claims because the letter contains compromise statements
that are not admissible pursuant to FRE 408.

the conclusiveness inquiry is the necessity that the court be presented with a set of facts from which it can make findings" for without "a concrete set of facts, the court cannot . . . declare the parties' rights based on those facts").

Here, the only "facts" that are before the Court are the allegations of the Amended Complaint, which themselves are based solely upon compromise statements made in a letter subject to FRE 408. As stated below, those "facts" should be stricken from the Amended Complaint. If, however, those allegations are permitted to stand, they still are insufficient to establish a case or controversy.

QVC seeks a declaratory judgment that "the Agreement shall be deemed renewed for an additional Renewal Term ending on April 1, *2009*." (Cmpl. at 8 (emphasis added).) This request is supposedly supported by the following allegations:

- Provided that the Net Retail Sales are equal to, or exceeds, the Minimum Amount for each Renewal Term, the Agreement is automatically renewed for an additional Renewal Term at an increased Minimum Amount. (Cmpl. ¶ 14.)

- The current Renewal Term does not expire until April, 2007. (Cmpl. ¶ 21.)

- QVC has met its obligations for the Agreement to automatically renew for an additional Renewal Term, which will expire in April, 2008. (Cmpl. ¶¶ 21, 22.)

One might think that QVC would be seeking a declaration, based upon the favorable resolution of these facts, that the Agreement will automatically renew in April, 2007 and will, therefore, not terminate before April, 2008. (There would, of course, still have to be allegations based upon competent evidence that Defendants have stated, without condition, that they deny these facts, disagree with QVC's interpretation of the contractual provisions, and/or quarrel with the application of these alleged facts to the contractual provisions such that a legal controversy exists to sharpen the issues for judicial resolution.)

This is <u>not</u>, however, what QVC seeks. Instead, QVC seeks a declaration that "the Agreement shall be deemed renewed for an additional Renewal Term ending on April 1, *2009*." (Cmpl. at 8 (emphasis added).) QVC provides no alleged factual underpinning for such relief because none yet exists, nor could one exist, because QVC will not be in a position to collect revenue for a one-year contract period ending on April 1, 2009, until at least April 1, 2008. Any number of events could happen between now and then that could materially change the set of facts upon which declaratory judgment would be entered.

To remedy this deficiency, QVC attempts to plead a set of hypothetical facts based upon QVC's speculation that Defendants will take some unspecified action after April, 2007 but before April, 2008 that "will thwart Plaintiff's ability to meet the requisite Net Retail Sales amount for the Renewal Term expiring on April 1, 2008." (Cmpl. ¶ 24.) A hypothetical based upon speculation cannot give rise to an actionable case or controversy. *See, e.g., United Mine Workers of Am. Int'l Union v. G.M. & W. Coal Co.*, 642 F. Supp. 57 (W.D. Pa. 1985) (emphasizing that declaratory judgment actions require a "substantial degree of specificity" in the complaint and dismissing complaint because it did not state, with the required degree of specificity, that plaintiffs were harmed or immediately threatened with harm, but only speculated that "at some uncertain future time, defendants 'may' terminate benefit payments").

Even if QVC had pled something more than mere speculation that Defendants supposedly will "thwart" QVC in the future, there is no basis upon which the Court could reasonably conclude that Defendants' attempts to "thwart" QVC would be successful. Indeed, if, under this hypothetical set of facts, Defendants' supposed attempts were *not* successful, then presumably QVC would argue in two years' time that the Agreement automatically renewed even if declaratory judgment had not yet been entered to that effect. Accordingly, the declaratory

8

judgment QVC seeks will not change or clarify the parties' respective positions and is purely

advisory in nature. *Travelers Ins*, 72 F.3d at 1155. *See also Pryor v. National Collegiate*

*Athletic Ass'n*, 288 F.3d 548 (3d Cir. 2002) (affirming dismissal because request for declaratory

relief was premised upon contingent events that would not take place, if at all, until some time in

the future and the court could "only speculate" that the harm feared may result).

### 3.     Declaratory Judgment Would Not Be of Practical Help to the Parties

Even assuming that the parties were adverse for purposes of the declaratory relief QVC

seeks and that QVC's claims were not based upon a hypothetical set of facts tied to conditions

that have yet to materialize, there is no indication that the Court's involvement in this action

would clarify the parties' legal positions.

QVC does not ask the Court to interpret contractual terms that allegedly are in dispute or

may be ambiguous. Nor does QVC ask the Court to decide whether alleged conduct is or is not a

breach of the Agreement. *Cf. Step-Saver Data Sys., Inc. v. Wyse Tech*, 912 F.2d 643, 649 (3d

Cir. 1990) (affirming dismissal of declaratory judgment claim as unripe because, among other

things, "[c]onstruing a contract and making law without finding the necessary facts constitutes

advisory opinion writing, and that is constitutionally forbidden"). Rather, the only thing QVC

asks the Court to do is to pronounce that the Agreement exists and that its terms include the

provisions recited in the Amended Complaint. The parties do not need a court to read for them

what they can read for themselves.

Currently, the parties are embroiled in business negotiations. (Ex. 1.) As is referenced in

the September 12 letter, QVC UK, an alleged affiliate of QVC, the Plaintiff in this action, has

asked the Defendants to execute a contract for the exclusive distribution in the United Kingdom

of health and beauty products sold under the trademark Models Prefer. (Ex. 1 at 2.) In order for

QVC UK and the Defendants to proceed with such a contract, however, the parties "have to

develop an alternative distribution venue in the US to support the volumes of orders from QVC

UK." (Ex. 1 at 1.) This alternative to the existing Agreement must be acceptable to all parties

involved -- QVC Inc., QVC UK, the Schieffelins and Models Prefer Ltd., which would be

assuming the Schieffelins' obligations -- and resolved amicably before the Defendants may

"proceed with QVC UK." (Ex. 1 at 1-2.) As the complaint makes crystal clear, to date QVC has

refused to terminate the Agreement amicably, even though termination would facilitate a more

favorable relationship between the Defendants and QVC's alleged affiliate, QVC UK, and has

not accepted the business solution proposed.

The only plausible explanation for QVC's request for a judicial declaration is to "flex its

muscles" to force Defendants into a business relationship that favors QVC, even if that means

the relationship between Defendants and QVC's alleged affiliate, QVC UK, suffers as a result.

Seeking court interference in a private business negotiation is not a proper use of the Declaratory

Judgment Act (or the courts in general). The matters raised in the Amended Complaint require

business negotiation and discussion, not judicial intervention, and the Amended Complaint

should be dismissed. *Travelers Ins.*, 72 F.3d at 1155 (reminding "declaratory judgment must

have utility" so that the legal relationships between the parties may be clarified). *See also*

*Williams v. National Sch. of Health Tech., Inc.*, 836 F. Supp. 273 (E.D. Pa. 1993), *aff'd* 37 F.3d

1491 (3d Cir. 1994) (exercising discretion not to proceed with declaratory judgment action

because it would not settle the controversy or afford the plaintiff relief); *American States Ins. Co.*

*v. Component Tech., Inc.*, 420 F. Supp.2d 373, 376 (M.D. Pa. 2005) (dismissing declaratory

judgment action because, among other things, it was based upon contingencies that may never

occur and "would merely provide advice or guidance to Plaintiff as to how to proceed through

settlement negotiations," which is "precisely the type of abstract disagreement that the ripeness

doctrine is designed to avoid").

C.    **Even if QVC Has Pled a Case or Controversy, This Court Should Exercise Its Discretion Not to Adjudicate Those Claims**

Even if a justiciable controversy did exist, dismissal still would be warranted under the

circumstances presented. *Zimmerman*, 834 F.2d at 1170 (reminding that the remedy of a

declaratory judgment is discretionary and may be refused even where a justiciable controversy

exists). For the reasons stated above, there is little, if any, basis upon which this Court could or

should render a declaratory judgment. In this context, the investment of judicial time and

resources to litigate and adjudicate this action would not be worthwhile. *See, e.g., National*

*Foam, Inc. v. Williams Fire and Hazard Control, Inc.*, No. Civ. A. 97-3105, 1997 WL 700496 at

*9 (E.D. Pa. Oct. 19, 1997) (stating that "considerations such as the importance of conservation

of judicial resources and the comprehensive disposition of litigation may mandate dismissal of

[a] declaratory judgment action"). The courts do not encourage, nor should they promote, such

"irresponsible litigation." *Id.* (dismissing action because it had been filed solely for forum-

shopping purposes).

II.    **QVC CANNOT STATE A CLAIM FOR RELIEF AS A MATTER OF LAW BECAUSE ALL ALLEGATIONS RELATING TO THE SEPTEMBER 12, 2006, LETTER SHOULD BE STRICKEN FROM THE COMPLAINT AND DISREGARDED PURSUANT TO FRE 408**

QVC's entire Amended Complaint is based upon statements made in a letter transmitted

to QVC on or about September 12, 2006. Paragraph 23 of the Amended Complaint alleges: "On

September 12, 2006, Defendants sent a purported notice of termination of the Agreement to

Plaintiff. Defendants have taken the position that the Agreement is terminated as of September

12, 2006 and have refused to further perform under the Agreement. In addition, Defendants have

stated their intention to promote and endorse the Products by means of Electronic Media in

violation of the non-competition provisions of the Agreement." (Cmpl. ¶ 23.) These allegations are based entirely upon statements in the September 12, 2006, letter, and paragraph 23 is the only paragraph in the Amended Complaint that sets forth factual allegations of Defendants' alleged conduct. The remaining allegations recite portions of the Agreement, refer back to the allegations of paragraph 23, or aver harm QVC expects to occur as a result of Defendants' alleged conduct.

A.    **The September 12, 2006 Letter Was Sent Solely for Compromise Purposes**

The September 12, 2006 letter is attached to Defendants' Motion as Exhibit 1. Because this letter forms the basis of QVC's claims and is referenced in the Amended Complaint, this Court properly may consider the letter when ruling on Defendants' Motion to Dismiss. *Qwest Communications Int'l v. Cyber-Quest, Inc*, 124 F. Supp.2d 297, 300 (M.D. Pa. 2000) ("In deciding a motion to dismiss, a court should generally consider only the allegations contained in the complaint, the exhibits attached to the complaint, matters of public record, and 'undisputably authentic' documents which the plaintiff has identified as the basis of his claims and which the defendant has attached as exhibits to his motion to dismiss." (*citing Pension Benefit Guaranty Corp. v. White Consolidated Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

The September 12, 2006 letter begins, before any substantive matters are discussed: "*SETTLEMENT OFFER - CONFIDENTIAL PURSUANT TO FRE 408.*" (Ex. 1 at 1.) Similarly, on page two after the compromise terms are outlined, the letter continues: "Please understand that the foregoing proposal represents our confidential proposed settlement terms and is not to be used for any other purposes or be deemed an admission of any nature or sort or to be admissible in any proceedings should such arise." (Ex. 1 at 2.)[2]

---

[2] As summarized above, in substance, the letter refers to QVC UK's request for a contract with Models Prefer Ltd. for the sale of color products marketed under the trademark Models Prefer.

**B.    All References to the September 12, 2006 Letter, to Any Statements Made Therein, or to the Alleged Effect Thereof, Should Be Disregarded for Purposes of this Motion**

Rule 408 of the Federal Rules of Evidence plainly states that "[e]vidence of conduct or statements made in compromise negotiations is . . . not admissible" to prove liability for a claim. F.R.E. 408. Yet this is precisely the purpose (and the only purpose) for which QVC refers to the September 12, 2006, letter.

An offer to compromise is not admissible for two reasons. First, a compromise offer is "deemed to be an indication only of a desire for peace," not as an admission of or the basis for liability. *Sternberger, v. United States*, 401 F.2d 1012, 1018 (Ct. Cl. 1968); *Philadelphia's Church of Our Savior v. Concord Twp*, No. Civ. A. 03-1766, 2004 WL 1824356 at *2 (E.D. Pa. July 27, 2004). This rationale finds full application here, where the September 12 letter on its face evidences a desire for peace and an attempt to avoid the very litigation QVC turned around and commenced. Second, the courts seek to promote the public policy favoring the compromise and settlement of disputes. Fed. R. Evid. 408, Advisory Committee Note; *Philadelphia's Church*, 2004 WL 1824356 at *2.

When confronted with a party that has knowingly used compromise offers or statements made in the compromise context to support its claim of liability or damages, federal courts either have stricken the allegations entirely or have disregarded those allegations when deciding a motion to dismiss. *See, e.g., Philadelphia's Church*, 2004 WL 1824356 at *2-3 (refusing to permit amendment of complaint because allegations were based upon settlement negotiations

---

Because execution of such a contract might be considered a breach of the Schieffelin's contract with QVC to sell products marketed under that same trademark and because the relationship between QVC and the Schieffelins had been deteriorating for quite some time, Models Prefer and the Schieffelins jointly proposed in the September 12 letter a business arrangement under which the contract with QVC would be terminated and a new contract with QVC UK would be formed. In this lawsuit, QVC turned around and used that business proposal to accuse Defendants of breach.

and because such allegations were inadmissible amendment would be futile); *Torvec, Inc. v. John Doe*, No. 00-CV-6856 CJS(F), 2001 WL 1822361 at *2 (W.D.N.Y. Sept. 10, 2001) (granting motion to strike plaintiff's reply to motion to dismiss under FRE 408); *Paley v. U.S.*, No. 95 Civ. 5180 (JFK), 1998 WL 470512 at *1 n.1 (S.D.N.Y. Aug. 11, 1998) (refusing to consider when deciding a motion to dismiss evidence proffered by plaintiff of statements made during the course of settlement negotiations); *Sanger v. Reno*, 966 F. Supp. 151 (S.D.N.Y. 1997) (plaintiff should not have submitted statements made in compromise discussions in opposition to motion to dismiss because they were made in compromise discussions and inadmissible). *Cf. Burdick v. Koerner*, 988 F. Supp. 1206, 1215 (E.D. Wis. 1998) (excluding from consideration on motion in limine correspondence between the parties made in the course of attempting to settle dispute); *Tiscornia v. Travelers Corp.*, No. 1:95 CV 862, 1996 WL 33170228 at *10 (W.D. Mich. Oct. 23, 1996) (granting motion to strike paragraphs of affidavits containing evidence of conduct or statements made in compromise negotiations from summary judgment papers).

This Court should follow that precedent here and should disregard the following paragraphs from QVC's Amended Complaint, all of which are inextricably tied to the September 12 letter or to the statements made therein: 23, 24, 25, 26, 27, 30, 33, 34, 37, 42, 47, 48, 51, 52, and 54. *Cf., Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir. 1987) (stating that "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers"). As a courtesy to the Court, a copy of the Amended Complaint with these paragraphs redacted is attached to Defendants' Motion as Exhibit 3.

### C.  Without Reference to the September 12, 2006 Letter, QVC Has Failed to State a Claim for Relief

Each and every one of the Counts in QVC's Amended Complaint is founded upon the allegations relating to the September 12, 2006, letter. When these allegations are properly

14

disregarded, it becomes apparent that the Amended Complaint pleads neither a factual nor a legal foundation for the claims asserted. (Ex. 3.) Accordingly, the Amended Complaint should be dismissed in its entirety. Fed. R. Civ. Proc. 12(b)(6).

**III.    QVC CANNOT STATE A CLAIM FOR BREACH OF CONTRACT OR FOR ANY RELATED RELIEF AGAINST DEFENDANT MODELS PREFER, WHICH IS NOT A PARTY TO THE CONTRACT ALLEGED**

The entire Amended Complaint is based upon a contract, which is defined and identified by QVC. In paragraph 10 of the Amended Complaint, QVC pleads: "The defendants Stacey Schieffelin and David Schieffelin, jointly and severally, and Plaintiff entered into a certain agreement (the 'Agreement') dated as of April 1, 1998 . . . ." In paragraph 19, QVC further pleads: "The defendants Stacey Schieffelin and David Schieffelin, jointly and severally, and Plaintiff entered into an Amendment to Agreement, dated as of April 24, 1999 (the 'Amendment') . . . . (The Agreement and the Amendment hereinafter referred to collectively as the 'Agreement')." The original Agreement to which QVC refers is attached to Defendants' Motion as Exhibit 2.

Nowhere does QVC allege that Defendant Models Prefer, Ltd. was ever a party to the Agreement. In fact, QVC acknowledges in its Amended Complaint that Defendant Models Prefer, Ltd. could *not* have been a party to the Agreement, which was originally executed in 1998 and amended only once in 1999, because the "defendant Models Prefer Ltd. was incorporated on or about September 17, 2002." (Cmpl. ¶ 11.) Nevertheless, and notwithstanding the fact that all of QVC's causes of action purportedly are based upon this contract, QVC has named Models Prefer Ltd., a non-party to the Agreement, as a defendant in this action.

It is black letter law that a person or entity who is not a party to a contract generally is not obligated under that contract and cannot be sued for its breach. *See, e.g., Fleetway Leasing Co. v. Wright*, 697 A.2d 1000, 1003 (Pa. Super. 1997) ("a person who is not a party to a contract

cannot be held liable for breach by one of the parties to a contract"); *Electron Energy Corp. v.*

*Short*, 408 Pa. Super. 563, 571, 597 A.2d 175, 178 (1991) ("it is fundamental contract law that

one cannot be liable for a breach of contract unless one is a party to that contract"); *Eisen v.*

*Independence Blue Cross*, Nos. 2705 Aug. Term 2000, Control 120761, 2002 WL 1023441 (Pa.

Com. Pl. May 6, 2002) (quoting *Electron Energy*). Similarly, a parent corporation is not

normally liable for the contractual obligations of its subsidiary, even if the subsidiary is wholly-

owned. *Nobers v. Crucible, Inc.*, 602 F. Supp. 703, 706 (W.D. Pa. 1985). This is because "a

corporation is to be treated as a separate and independent entity even if its stock is owned

entirely by one person" or by one entity. *Commonwealth v. Vienna Health Prods., Inc.*, 726

A.2d 432, 434 (Pa. Commw. Ct. 1999).[3]

   QVC fails to plead any basis upon which Defendant Models Prefer Ltd. could be liable

for any obligations that the Schieffelins as individuals may have under the Agreement. There is

no allegation that the Agreement ever was assigned to Models Prefer Ltd., and under the

Agreement's plain terms it could not be assigned without the express consent of QVC. (*See* Ex.

2 at 3 § 5(e).)[4] There is no allegation that the Agreement ever was amended to add Models

Prefer Ltd. as a party, and in fact it was not so amended. And there is no allegation that for any

other reason Models Prefer Ltd. legally became obligated under the terms of the Agreement. *Cf.*

*QVC, Inc. v. Starad, Inc.*, No. Civ. A. 03-5298, 2005 WL 742500 at *12 (E.D. Pa. Mar. 31,

2005) (prohibiting QVC from modifying terms of written, integrated contract for sale of goods

through alleged course of dealing because, among other things, such an amendment would

---

[3] Here we are not presented with a parent-subsidiary relationship between the Schieffelins and
Models Prefer Ltd. Nevertheless, the analogy holds because QVC apparently is attempting to
reach Models Prefer, Ltd. through the Schieffelins.

[4] Of course, if the Agreement were assigned, then the Schieffelins would not be liable for any
alleged breach.

violate statute of frauds).  Accordingly, this Court should dismiss Models Prefer Ltd. from this action.

## IV.    IN THE EVENT THE COMPLAINT IS NOT DISMISSED, ALL ALLEGATIONS BASED UPON THE SEPTEMBER 12, 2006, LETTER SHOULD BE STRICKEN

As explained above, any allegations that are based upon the September 12, 2006, letter are inadmissible under FRE 408.  In the event that this Court does not dismiss the Amended Complaint in its entirety, all allegations based upon or referring to this letter should be stricken from the Amended Complaint, and QVC should be directed to file a Second Amended Complaint in the form attached to Defendants' Motion as Exhibit 3 (with all references to Models Prefer Ltd. also removed).  *See, e g , Scott v. Township of Bristol*, Civ. A. No. 90-1412, 1991 WL 40354 at *5 (E.D. Pa. Mar. 20, 1991) (striking allegations of statements made during settlement discussions from amended complaint); *United States Transmission Sys , Inc  v. Americas Ctr , Inc* , Civ. A. No. 85-7044, 1986 WL 13838 *2 (E.D. Pa. Dec. 3, 1986) (granting motion to strike paragraphs of complaint that referred to settlement negotiations).  *See also* Section II.B. above.

## CONCLUSION

For all of the foregoing reasons, the Amended Complaint should be dismissed in its entirety. In the alternative, if the Amended Complaint is not dismissed in its entirety, Defendant Models Prefer, Ltd. should be dismissed from all counts; paragraphs 23, 24, 25, 26, 27, 30, 33, 34, 37, 42, 47, 48, 51, 52, and 54 should be stricken from the Amended Complaint; and QVC should be directed to file a Second Amended Complaint in the form attached to Defendants' Motion as Exhibit 3 (with all references to Models Prefer Ltd. also removed).

Dated: November 17, 2006                    Respectfully Submitted,

                                            BUCHANAN INGERSOLL & ROONEY PC

                                            By: /s/ Antoinette R. Stone (3519)
                                                Antoinette R. Stone (Pa. I.D. No. 23464)
                                                1835 Market Street, 14th Floor
                                                Philadelphia, PA 19103
                                                (215) 665-8700

                                            *Attorneys for Defendants Stacey Schieffelin,
                                            David Schieffelin and Models Prefer, Ltd.*

# EXHIBIT 1

**Buchanan Ingersoll & Rooney** PC
Attorneys ...

One Chase Manhattan Plaza
35th Floor
New York, New York 10005
T 212 440 4400
F 212 440 4401
www.buchananingersoll.com

Sharon Blinkoff
212 440 4475
sharon.blinkoff@bipc.com

*SETTLEMENT OFFER - CONFIDENTIAL*
*PURSUANT TO FRE 408*

September 12, 2006

**Via Facsimile and Regular Mail**

Larry Hayes, Esq.
Legal Department
QVC Inc
1365 Enterprise Drive
West Chester, PA 19380

Re:    **MODELS PREFER LTD.**

Dear Larry:

Further to our conversation last Friday, I have set forth below our proposed business terms governing the cessation of business between our clients, Models Prefer Ltd. and David and Stacey Schieffelin, and QVC US. For good orders sake, this also serves as formal notice of our client's termination of any outstanding agreements with QVC US.

A simple review of the history of my client's business in the US shows that the frequency and placement of air time of my client on QVC US has been drastically eroded, which has resulted in a significant decline in sales volumes of Models Prefer's products. In fact, my client's last on-air date this year was in June. There are no dates scheduled for the balance of this year or for 2007. Even more significant, there is no TSV date scheduled for 2007. Clearly QVC US has withdrawn its support of Models Prefer. Hence, this termination should come as no surprise to QVC US.

Notwithstanding severance of my client's relations with QVC US, they would like to continue a relationship with QVC UK. But , for my clients to proceed with the QVC UK, which we believe is in the best interests of all concerned, we have to develop an alternate distribution venue in the US to support the volumes of orders from QVC UK. The intention of my client is to pursue classic retail opportunities, as well as Internet sales. While my client may consider infomercials, it has no intention of moving to HSN at this time.

QVC Inc.
September 12, 2006
Page - 2 -

    With the above in mind and provided that the termination with QVC US is amicable, my client's business proposal is as follows:

    1.  Models Prefer Ltd. takes back all outstanding inventory with QVC US, which at QVC US's cost is approximately $450,000.00. This does not represent a liability to QVC US since QVC US takes my client's product on a consignment basis and has not yet paid for this inventory. What we propose is that my client take physical control over the inventory and accept a return from QVC US's warehouse.

    2.  Models Prefer Ltd. assumes QVC US's obligation to fulfill continuity orders.

    3.  Models Prefer Ltd. agrees not to sell product on HSN for a twelve month period commencing on June 15th, the last on-air date of my client's products on QVC US.

    4.  Models Prefer Ltd.'s principle, Stacey Schieffelin, agrees not to appear on HSN for a twelve month period commencing on June 15th, Ms. Schieffelin's last on-air date on QVC US.

    5.  The parties exchange mutual releases.

    Again, as I have discussed with David Lancelot, assuming the above is acceptable, my clients are prepared to move forward with the QVC UK contracts that Mr. Lancelot has circulated. Please understand that the foregoing proposal represents our confidential proposed settlement terms and is not to be used for any other purposes or be deemed an admission of any nature or sort or to be admissible in any proceedings should such arise.

    For reasons which I am sure you can understand we need to conclude this matter quickly. Specifically, if QVC US is unwilling to agree to the proposal outlined above, Models Prefer will consider all available options. However, we believe the above is incredibly fair, and therefore, look forward to your cooperation in working towards an amicable cessation. Accordingly, I would like to see if we can wrap this up this week on the terms outlined above.

    I await your prompt response.

        Sincerely,

        Sharon Blinkoff

SAB/ksk

cc:   David Schieffelin (Models Prefer Ltd.)

#342582-v1

# EXHIBIT 2

## AGREEMENT

THIS AGREEMENT ("Agreement") is dated April 1, 1998 and is between DAVID AND STACEY SCHIEFFELIN (jointly and severally, "Vendor"), and QVC, Inc., a Delaware corporation ("QVC").

Vendor has developed and/or controls all rights of distribution and sale with respect to health and beauty products marketed under the trademark MODELS PREFER (collectively, the "Products" and each, individually, a "Product"). QVC wishes to promote, advertise, market, sell and distribute (collectively, "Promote") the Products and feature Stacey Schieffelin on televised shopping programs produced by or for and aired by QVC and its affiliates to assist in promoting the Products ("Programs"). In consideration of the mutual promises and undertakings set forth herein, and intending to be legally bound hereby, the parties agree as follows:

1. Purchases and Sales of Products.

(a) Marketing Rights. QVC shall have the exclusive worldwide right to Promote the Products through all means and media, including, without limitation, Electronic Media (which, for purposes of this Agreement, shall mean all electronic transmissions, whether now in existence or developed hereafter, through which a consumer is requested to purchase any product by mail, telephone or other electronic means, including without limitation, televised electronic retailing programs, infomercials, direct response commercial spots and computerized shopping services, whether on-line services or otherwise).

(b) Consignment Orders. From time to time, QVC may issue to Vendor consignment orders for Products, in substantially the form of Exhibit 1 attached hereto. Each consignment order so issued shall be incorporated herein by reference, and its terms and conditions shall fully apply with respect to the subject matter thereof (excepting only to the extent of any inconsistencies between such terms and conditions and those of this Agreement, as to which matters this Agreement shall govern).

(c) Returned Goods. Notwithstanding QVC's exclusive rights hereunder to Promote the Products, Vendor may sell all Products consigned to QVC and thereafter returned to Vendor by such means and media upon which the parties may mutually agree (it being acknowledged and agreed that QVC may withhold approval of any proposed disposition of such Products which, in the reasonable judgment of QVC, might conflict with QVC's Promotion of the Products or otherwise impair QVC's ability to exercise its rights hereunder to Promote the Products).

2. Term.

(a) Generally. Subject to Section 2(b) hereof, the initial term of this Agreement (the "Initial Term") shall commence on the date hereof and shall expire two (2) years after the date of this Agreement. Upon the expiration of the Initial Term, this Agreement shall automatically and continually renew for successive additional one (1) year terms (each a "Renewal Term" and the Initial Term and each Renewal Term each being referred to herein as a "Term"), unless (i) Vendor notifies QVC in writing, at least thirty (30) days prior to the end of a Term, of its intent to terminate the Agreement, and (ii) during such Term, Net Retail Sales of Products are in the aggregate less than the Minimum Amount. For purposes of this Agreement, "Minimum Amount" shall mean (i) $3,500,000 in the Initial Term, (ii) $2,000,000 in the first Renewal Term and (iii) for each succeeding Renewal Term, one hundred and five percent (105%) of the Minimum Amount applicable to the preceding Renewal Term. For purposes of this Agreement, "Net Retail Sales" shall mean the gross sales price paid by customers of QVC or its affiliates for Products, exclusive of any (i) sales, use, excise or value-added taxes, (ii) credits, returns, discounts, settlements or other allowances, (iii) customs duties, tariffs or similar import impositions due from QVC

or its affiliates, (iv) shipping and handling charges and (v) all fees due from QVC or its affiliates for licenses, registrations and approvals necessary for the importation and the promotion of the Products.

(b) Early Termination. Notwithstanding Section 2(a) hereof, this Agreement shall automatically terminate in the event that no Product airs on a Program by December 31, 1998 and such failure is not attributable, in whole or in part, to (i) any inability beyond QVC's reasonable control to obtain sufficient supplies of Products, (ii) the failure of Stacey Schieffelin to make such scheduled Appearance (as defined in Section 3 hereof), or (iii) any other breach by Vendor of any of its or their representations, warranties, covenants or undertakings under this Agreement.

3. Appearances. If requested by QVC and subject to her reasonable availability, Stacey Schieffelin shall make Appearances on Programs. For purposes of this Agreement, an "Appearance" shall mean the personal appearance by Stacey Schieffelin during a one- (1) to three- (3) day period on Programs in which Products may be offered for sale. Unless otherwise determined by QVC, all Appearances shall take place at QVC's studios in West Chester, Pennsylvania. QVC makes no representations or warranties with respect to the number of Appearances, if any, that it may request Mrs. Schieffelin to make. Vendor acknowledges that each Appearance will be on live, unscripted television and, as a consequence thereof, Vendor shall have no prior right of approval over the content of Mrs. Schieffelin's Appearances. At QVC's request and subject to her reasonable availability, Mrs. Schieffelin shall attend rehearsals and production meetings in connection with the Appearances, The dates, time and location of such rehearsals and meetings shall be on the dates on which Mrs. Schieffelin makes an Appearance or on other dates mutually agreed to between Vendor and QVC.

4. Noncompetition. Vendor shall not promote or endorse any consumer goods (including, without limitation, the Products) by means of Electronic Media during any Term and for one (1) year after the expiration or termination of this Agreement. If the foregoing restriction is determined by any court of competent jurisdiction to be unenforceable by reason of its extending for too long a period of time or over too large a geographical area or by reason of its being too extensive in any other respect, it shall be interpreted to extend only over the longest period of time for which it may be enforceable, and/or over the largest geographical area as to which it may be enforceable and/or to the maximum extent in all other aspects as to which it may be enforceable, all as determined by such court in such action. The duration of the foregoing restriction shall be tolled during any period of violation thereof. The foregoing restriction shall not apply if, pursuant to Section 2(b) hereof, this Agreement automatically terminates in the event that no Product airs on a Program by December 31, 1998, The provisions of this Section 4 shall survive the termination of this Agreement.

5. Miscellaneous.

(a) Notices. All notices, requests, instructions, consents and other communications to be given pursuant to this Agreement shall be in writing and shall be deemed received (i) on the same day if delivered in person, by same-day courier or by telegraph, telex, facsimile or other electronic transmission, (ii) on the next day if delivered by overnight mail or courier, or (iii) on the date indicated on the return receipt, or if there is no such receipt, on the third calendar day (excluding Sundays) if delivered by certified or registered mail, postage prepaid, to the party for whom intended to the following addresses:

If to Vendor:
David and Stacey Schieffelin
84 Highland Road
Glen Cove, NY 11542-2630
FAX: (516) 656-9486

With a copy to:
Daniel Tannenbaum, Esq
111 Great Neck Road
Great Neck, NY 11021
FAX: (516) 829-1008

QVC|MAF1.032498

-2-

If to QVC:
    QVC, Inc.
    1365 Enterprise Drive
    West Chester, PA 19380
    Attention: Neal S. Grabell, Esq.
    FAX:  (610) 701-1380

       Each party may by written notice given to the other in accordance with this Agreement change the address to which notices to such party are to be delivered.

       (b) Entire Agreement. This Agreement and all consignment orders issued to Vendor hereunder together contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, whether written or oral, between them with respect to the subject matter hereof and thereof. Each party has executed this Agreement without reliance upon any promise, representation or warranty other than those expressly set forth herein.

       (c) Amendment. No amendment of this Agreement shall be effective unless embodied in a written instrument executed by all of the parties.

       (d) Waiver of Breach. The failure of any party hereto at any time to enforce any of the provisions of this Agreement shall not be deemed or construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any provisions hereof or the right of any party hereto to thereafter enforce each and every provision of this Agreement. No waiver of any breach of any of the provisions of this Agreement shall be effective unless set forth in a written instrument executed by the party against whom or which enforcement of such waiver is sought; and no waiver of any such breach shall be construed or deemed to be a waiver of any other or subsequent breach.

       (e) Assignability. This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns; provided, however, except as otherwise expressly permitted hereunder, no party hereto may assign this Agreement or any rights hereunder to any person or entity without the prior written consent of the other party (which shall not be unreasonably withheld), and any attempted assignment without such consent shall be void. Notwithstanding the foregoing, it is understood and agreed that QVC may exercise its rights and perform its obligations hereunder, in whole or in part, by itself or through any one or more of its existing and future affiliates.

       (f) Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal substantive and procedural laws of the Commonwealth of Pennsylvania without regard to conflict of laws principles. The parties consent to the personal jurisdiction and venue of the Court of Common Pleas of Chester County (Pennsylvania) and the United States District Court for the Eastern District of Pennsylvania and further consent that any process, notice of motion or other application to either such court or a judge thereof may be served outside the Commonwealth of Pennsylvania by registered or certified mail or by personal service, provided that a reasonable time for appearance is allowed.

       (g) Severability. All of the provisions of this Agreement are intended to be distinct and severable. If any provision of this Agreement is or is declared to be invalid or unenforceable in any jurisdiction, it shall be ineffective in such jurisdiction only to the extent of such invalidity or unenforceability. Such invalidity or unenforceability shall not affect either the balance of such provision, to the extent it is not invalid or unenforceable, or the remaining provisions hereof, nor render invalid or unenforceable such provision in any other jurisdiction.

QVC(MAF).032488

-3-

(h) <u>Joint and Several</u>. The rights and obligations of David Schieffelin and Stacey Schieffelin hereunder shall be joint and several.

(i) <u>Independent Contractor</u>. Neither party nor any of its officers, employees, agents or representatives is an employee or agent of any other party for any purpose whatsoever. Rather, each party is and shall at all times remain an independent contractor.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the date first written above.

By: _____
David Schieffelin

By: _____
Stacey Schieffelin

QVC, Inc.

By: _____

Title: _____

QVC(MAF).032498

-4-

Exhibit 1

## FORM OF PURCHASE ORDER

THIS CONSIGNMENT ORDER ("Order") IS EXPRESSLY CONDITIONED ON ACCEPTANCE OF THE TERMS AND CONDITIONS HEREOF. Oral or written notice of acceptance by Consignor, preparation to perform by Consignor and/or shipment of all or any part of the merchandise specified in this Order ("Merchandise") shall constitute acceptance by Consignor of the terms and conditions contained herein. BY ACCEPTANCE OF THIS ORDER, CONSIGNOR REPRESENTS AND AGREES AS FOLLOWS:

1. Consignor will ship to a warehouse designated by Consignee (the "Warehouse") the Merchandise on the terms specified herein. All Merchandise shall be held on consignment at the Warehouse at Consignor's risk. From time to time, Consignee may withdraw Merchandise from consigned stock at the Warehouse and take delivery thereof by packaging Merchandise for delivery to Consignee's identified customers. Upon each such withdrawal, title to the Merchandise so withdrawn shall pass to Consignee at the prices and on the terms and conditions herein.

2. Consignor hereby grants to Consignee the irrevocable right, by all means now or hereafter existing, to: (a) market, promote the sale of and sell the Merchandise; (b) use the trademarks, trade names, service marks, patents and copyrights (collectively the "Marks") registered, owned, licensed to or used by Consignor in connection with the Merchandise; (c) use, perform, play, synchronize and/or demonstrate, as applicable, the Merchandise, its contents, and/or any promotional, advertising or similar material supplied by Consignor for use in connection with such Merchandise ("Promotional Material"); and (d) use the names, photographs, likenesses, voices and/or biographies of any individuals performing in or otherwise associated with the production of the Merchandise as contained in the Merchandise, its contents and/or any Promotional Material. Consignee makes no representations with regard to the number of times, if any, that Merchandise will be marketed, promoted or sold by Consignee.

3. In addition to and without prejudice to any and all other warranties, express or implied by law, Consignor represents, warrants and covenants to Consignee that: (a) Consignor possesses all licenses, permits, rights, powers and consents required to enter into and perform this Order, to sell to

Consignee the Merchandise referenced herein and to grant to Consignee the rights granted herein; (b) Consignor's performance hereunder does not violate any agreement, instrument, judgment, order or award of any court or arbitrator; (c) all Merchandise furnished hereunder, including the production, sale, packaging, labeling, safety, testing, importation and transportation thereof, and all representations, advertising, prices, and allowances, discounts or other benefits made, offered or authorized by Consignor in connection therewith, shall at all times comply with all applicable federal, state, local, industry and foreign statutes, laws, rules, regulations, orders, standards and guidelines (collectively, "Laws"); (d) where applicable, reasonable and representative tests as prescribed by Laws or governmental authorities have been performed or will be performed before shipment from Consignor to the Warehouse; (e) all Merchandise furnished hereunder shall be new, first quality merchandise and conform to all representations by Consignor, instructions, specifications, and samples, shall be free from all defects (including latent defects) in workmanship, material and design, and shall not be rewirked, rebuilt or refurbished merchandise; (f) all manufacturers' warranties are effective and enforceable by both Consignee and its customers; (g) all Marks which are part of or appear in connection with the Merchandise and/or Promotional Material, and/or any component thereof, are valid and genuine, and the sale, promotion of the sale and performance of the Merchandise and/or Promotional Material, and/or any component thereof, will not infringe upon any domestic or foreign Marks, rights of privacy or publicity and/or any other third party rights, or cause Consignee to be liable to Consignor or any third party for any additional fees, costs or expenses; (h) the title of Consignor to the Merchandise is good and free and clear of all encumbrances and liens, and its transfer hereunder rightful; (i) neither the Merchandise nor any component part thereof is subject to any import quota restriction, rule or regulation preventing or forbidding the importation, use, promotion for sale or sale of the Merchandise or any component part thereof, or any duty, tariff, or penalty in connection therewith, except as previously disclosed in writing by Consignor to Consignee; (j) the Merchandise and similar goods are not and have not been subject to product liability or infringement claims, except as disclosed on the face hereof; (k) Consignor shall

QVC\MAF).032495

-5-

maintain for the life of the Merchandise general liability insurance coverage on the Merchandise, including full product liability, infringement and advertising injury, in amounts no less than One Million Dollars per occurrence, unless otherwise specified on the face hereof, with carriers acceptable to Consignee, and which shall include broad form vendor's coverage in favor of Consignee, and Consignor will promptly provide Consignee with a certificate of insurance naming Consignee as an additional insured; and (i) the same or similar merchandise is not being and will not be offered to any other consignee or purchaser at a lesser cost or under more favorable terms than appear herein. Consignor agrees to provide Consignee with any and all documents requested or required by Consignee at any time and from time to time to support the representations, warranties and covenants herein contained.

4. Consignor hereby agrees to protect, defend, hold harmless and indemnify Consignee, its subsidiaries and affiliates, and each of their respective customers, programming and other distributors, employees, agents, officers, directors, successors and assigns, from and against any and all claims, actions, suits, costs, liabilities, damages and expenses (including, but not limited to, reasonable attorneys' fees) based upon or resulting from: (a) any alleged or actual infringement of any Marks, rights of publicity or privacy and/or any other third party rights arising from the sale, promotion of the sale and/or performance of the Merchandise, its contents and/or the Promotional Material; (b) any alleged or actual defect in any of the Merchandise; (c) any alleged or actual injury or death to person or damage to property arising out of the furnishing, use or performance of the Merchandise; (d) breach by Consignor of any representations, warranties or covenants; and (e) any alleged or actual violation by Consignor and/or the Merchandise of any applicable Laws. In the event Consignee notifies Consignor in writing of a claim, demand, action, suit or other matter ("Claim") to which the foregoing indemnity applies, Consignor shall provide prompt assurance of its ability to so indemnify Consignee, to Consignee's reasonable satisfaction, and Consignor shall commence to defend such Claim, at its sole cost and expense, within five (5) days after receiving Consignee's written notice. If Consignor fails to provide such assurance or fails to commence such defense within such five (5)-day period, Consignee may, at its option, assume the defense or settlement of such Claim in its own name and all recoveries from such Claim shall belong to Consignee. In the latter event, which shall be in addition to any and all other rights Consignee may have at law or in equity, Consignee may elect counsel to represent it, and Consignor shall be solely responsible for the

payment or reimbursement, at Consignee's option, of counsel fees and all other fees and costs incurred in defending such Claim, for any and all damages arising thereunder, and for any and all amounts paid by Consignee in settlement thereof.

5. Time is of the essence. Consignee reserves the right to cancel this Order or any part hereof, with no liability or obligation to Consignor, in the event: (a) Consignee is notified that any Merchandise or Mark infringes or is alleged to infringe upon any third party rights; (b) Consignor breaches or is anticipated to breach this Order; (c) Merchandise conforming to specifications will not be delivered or arrive at the Warehouse on the dates and in the quantities specified on the face hereof; (d) fire, flood, windstorm, earthquake, war, strike, or any other casualty or occurrence of a similar nature substantially and adversely affects Consignee's premises or business; or (e) any substantial change to Consignee's business (for whatever reason) occurs.

6. Merchandise shipped or delivered to the Warehouse prior to the first permitted ship or delivery date specified on the face hereof, may, at Consignee's option be returned to Consignor, at Consignor's risk and expense, and upon such return, shall be held by Consignor for Consignee until shipment or delivery on the specified date. Merchandise shipped or delivered to the Warehouse after the last permitted ship or delivery date specified on the face hereof may, at Consignee's option, be returned to Consignor, at Consignor's risk and expense, and upon such return, Consignee may cancel this Order, in whole or in part, without liability or the Merchandise may be held by Consignee on consignment hereunder. Unless otherwise stated on the face hereof, Consignor shall ship the Merchandise in one shipment. In the event of shipment or receipt of an unauthorized quantity, Consignee may, at its option, either reject or accept the entire shipment unless partial shipments are authorized on the face hereof. Additional freight charges resulting from partial shipments shall be borne by Consignor. Partial shipments shall not cause Consignor's obligations to become severable. Unless otherwise stated on the face hereof, Consignor shall pay or reimburse Consignee, at the direction of Consignee, for all freight, packing and insurance incident to the shipment of the Merchandise, including, but not limited to, loading and unloading charges, mileage charges, taxes, tolls and other fees. Consignor agrees to follow Consignee's instructions with respect to shipment, routing and packaging. Consignor's failure to comply with the terms and conditions set forth in this Section or in Consignee's shipping regulations (including chargeback program) ("Regulations") or in

DVC(MAF).032406

-6-

any applicable standards provided by Consignee to Consignor ("Standards"), in effect as of the date of this Order, and which are incorporated herein by reference, may, at Consignee's option, result in the imposition of charges as set forth in such documents. Any such charges assessed may be deducted from any amounts due or which may become due to Consignor. Copies of the Regulations and the Standards are available to Consignor upon written request to Consignee.

7. Merchandise furnished hereunder which is not in compliance with this Order, the Regulations or the Standards, which is returned by any of Consignee's customers for any reason, which fails to meet Consignee's quality control tests, which fails to meet Consignee's carrier's quality, drop or other tests, or which is or may be used in conjunction with merchandise furnished and rejected (or acceptance thereof revoked) under this Order or another order, may be rejected (or acceptance thereof by Consignee revoked) at Consignee's option and returned to Consignor. All expense of unpacking, examining, repacking, storing, returning and reshipping any Merchandise rejected (or acceptance of which has been revoked) as aforesaid shall be at Consignor's expense and risk. With respect to such returned Merchandise, Consignee shall, at its option, receive a credit or refund of all amounts paid by Consignee for such Merchandise, including, without limitation, in-bound freight charges (notwithstanding contrary Freight Terms, if any, set forth on the face hereof). In the event that Consignee shall opt to receive a refund, Consignor shall pay Consignee in immediately available funds within fifteen (15) days of Consignee's request. In the event that Consignee shall opt to receive a credit, Consignee may apply such a credit toward any amounts due or which may become due to Consignor. Upon receipt by Consignee of returns from its customers, title and risk of loss to such returned Merchandise shall immediately revert to Consignor. Consignor agrees that Merchandise rejected or returned for any reason pursuant to the terms of this Order, whether or not such rejection is disputed by Consignor, will not be resold or otherwise distributed by Consignor unless all labels and other characteristics identifying Consignee and/or displaying any trade name or trademark of Consignee have been first removed. Authorization is granted to Consignee to return Merchandise without additional authorization, and Consignor hereby agrees to accept such returns even without Consignee's request for return authorization labels. Merchandise returned or rejected by Consignee is not to be replaced by Consignor without the prior written approval of Consignee. Consignor acknowledges that the Consignee does not inspect each item at receipt of Merchandise and that

defects, imperfections or nonconformity with, any representations, warranties or covenants set forth herein may not be discovered by Consignee until Merchandise shall have been purchased by its customers and returned to Consignee. Consignee's inspection, discovery of a breach of warranty, failure to make an inspection or failure to discover a breach of warranty shall not constitute a waiver of any of Consignee's rights or remedies whatsoever.

8. Consignee may, at any time, elect to return to Consignor all or any portion of the Merchandise held on consignment hereunder. Consignee shall give notice to Consignor of Consignee's election to make such return, and Consignor shall, without the requirement of any return authorization, return such Merchandise or portion thereof to Consignor at Consignee's expense and Consignor shall accept such Merchandise.

9. Consignor shall not assign this Order, or any part hereof, without the prior written consent of Consignee, and any such attempted assignment shall be void at the election of Consignee. All claims for money due or to become due from Consignee shall be subject to deduction by Consignee for any set-off or counterclaim arising out of this Order or any other of Consignee's orders or agreements with Consignor, whether such set-off or counterclaim arose before or after any assignment by Consignor.

10. Until date of purchase by Consignee, Consignor shall meet its lower prices and the lower prices of legitimate competition, or accept cancellation at Consignee's option. Consignee, in its sole discretion, shall determine the price at which Merchandise shall be offered for sale to its customers and shall retain all handling and shipping charges collected from its customers.

11. Prior to the thirtieth (30th) day of each month, Consignee shall remit payment to Consignor for Merchandise sold and shipped by Consignee to its customers during the previous month, less the Reserve (as defined below), and adjusted for any credits, debits, customer returns, refunds, and allowances. If a percentage greater than zero is indicated in the "Payment Reserve" designation on the face hereof, then Consignee will withhold an amount equal to such percentage of the gross monthly sales (the "Reserve") from each such monthly payment to Consignor. The amount so withheld shall be applied toward actual Consignee customer returns occurring during the succeeding calendar month. In the event that actual returns during such period exceed the Reserve deducted in the prior month, such excess amount shall, at Consignee's option, be immediately debited against Consignor's account with Consignee or paid by

Consignor to Consignee within fifteen (15) days of receipt of Consignee's request for such payment. In the event that actual returns during such period are less than the Reserve deducted in the prior month for such returns, the balance of the Reserve remaining at the conclusion of such period shall, at Consignee's option, be credited to Consignor's account or paid to Consignor. Neither the arrival of the Merchandise at the Warehouse, nor payment hereunder, shall constitute acceptance of Merchandise, and such arrival or payment is without prejudice to any and all claims of Consignee against Consignor.

12. At Consignee's request, Consignor agrees to meet with Consignee or its agents at a location determined by Consignee to reconcile Consignor and Consignee records regarding Merchandise. In the event that Consignor fails for any reason to attend such meeting, or in the event that Consignee shall not request that a meeting be held, Consignee shall submit its reconciliation report to Consignor. Any discrepancy must be reconciled within thirty (30) days from the date of the reconciliation meeting or within thirty (30) days from the date of Consignor's receipt of Consignee's reconciliation report (whichever shall apply) and a reconciliation statement must be signed within such thirty (30) day period. Should the parties fail to sign a reconciliation statement within such period of time, Consignee's records shall be binding on the parties.

13. For purposes of this Order, "Confidential Information" means any agreement between Consignee and Consignor, all information in whatever form transmitted relating to the past, present or future business affairs, including without limitation, the sale of Merchandise, customer lists and other customer information, research, development, operations, security, broadcasting, merchandising, marketing, distribution, financial, programming and data processing information of Consignee or another party whose information Consignee has in its possession under obligations of confidentiality, which is disclosed by Consignee, its subsidiaries, affiliates, employees, agents, officers or directors to Consignor or which is produced or developed during the working relationship between the parties. Confidential Information shall not include any information of Consignee that is lawfully required to be disclosed by Consignor to any governmental agency or is otherwise required to be disclosed by law, provided that before making such disclosure Consignor shall give Consignee an adequate opportunity to interpose an objection or take action to assure confidential handling of such information. Consignor shall not disclose any Confidential Information to any person or entity except employees of Consignor as required in the

performance of their employment-related duties in connection with this Order, nor will Consignor use the Confidential Information for any purpose other than those purposes expressly contemplated herein. Consignor shall not use any information obtained from Consignee's customers (e.g., through warranty cards or otherwise) to offer for sale to such customers any goods or services. Consignor shall not include with any Merchandise, any information that would enable Consignee's customers to acquire, either directly or indirectly, any additional merchandise from persons other than Consignee, without first obtaining Consignee's written consent. In the event of a breach or threatened breach of this Section by Consignor, Consignee shall be entitled to obtain from any court of competent jurisdiction, preliminary and permanent injunctive relief, including, but not limited to, temporary restraining orders, which remedy shall be cumulative and in addition to any other rights and remedies to which Consignee may be entitled. Consignor agrees that the Confidential Information referred to in this Section is valuable and unique and that disclosure or use thereof in breach of this Section will result in immediate irreparable injury to Consignee. Consignor shall inform those persons or entities having access or exposure to Confidential Information hereunder, of Consignor's obligations under this Section.

14. This Order shall be governed by the laws of the Commonwealth of Pennsylvania applicable to contracts to be performed wholly therein, regardless of place of acceptance. Consignor and Consignee expressly exclude the application of the United Nations Convention on Contracts for the International Sale of Goods, if applicable. Consignor hereby consents to the exclusive jurisdiction of the state courts of the Commonwealth of Pennsylvania for the County of Chester and the federal courts for the Eastern District of Pennsylvania in all matters arising hereunder. Consignor hereby irrevocably agrees to service of process by certified mail, return receipt requested, to its address as set forth on the face of this Order or to such other address as Consignor may deliver to Consignee in writing.

15. Consignor shall include the value of all consigned stock in any tax return of personal property required to be filed with the local taxing authority and Consignor shall pay the taxes applicable thereto.

16. No waiver by Consignee of any term, provision or condition hereof shall be deemed to constitute a waiver of any other term, provision or condition of this Order, or a waiver of the same or of any other term, provision or condition with regard to subsequent transactions or subsequent parts of the

OVCIMAFI:032498

-8-

same transaction, including without limitation, subsequent shipments under this Order.

17. If any provision contained in this Order shall be determined to be unenforceable or prohibited by law, then such provision shall be void, and the remaining provisions herein shall not in any way be affected or impaired thereby.

18. Consignor shall not issue any publicity or press release regarding Consignee or Consignee's activities hereunder without first obtaining Consignee's prior written approval and consent to such release.

19. This Order and any other written warranties and specifications, the Regulations and Standards, and the terms, conditions and agreements herein and therein, constitute the full understanding of the parties hereto and a complete and exclusive statement of the terms of the parties' agreement concerning the Merchandise furnished hereunder.

20. No condition, understanding or agreement purporting to modify or vary the terms of this Order shall be binding unless hereafter made in writing and duly executed by the party to be bound, and no modification shall be effected by the acknowledgment or acceptance of this Order or of invoices, shipping documents or other documents containing terms or conditions at variance with or in addition to those set forth herein.

21. Notwithstanding any legal presumption to the contrary, the covenants, conditions, representations, indemnities and warranties contained in this Order, including, but not limited to Sections 3, 4, 7 and 13 hereof, shall survive inspection, delivery, acceptance and payment, shall be binding upon Consignor and its successors and permitted assigns, and shall run in favor of Consignee and its successors and assigns

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QVC, INC.<br>Studio Park<br>1200 Wilson Drive<br>West Chester, Pennsylvania 19380 | : : : : : | CIVIL ACTION |
| Plaintiff, | : : | NO 06-cv-4231 |
| v | : : | |
| STACEY SCHIEFFELIN<br>567 S Leonard Street, #1<br>Waterbury, Connecticut 06708<br>    and<br>DAVID SCHIEFFELIN<br>567 S Leonard Street, #1<br>Waterbury, Connecticut 06708<br>    and<br>MODELS PREFER, LTD.<br>567 S Leonard Street, #1<br>Waterbury, Connecticut 06708 | : : : : : : : : : : : : : : | |
| Defendants. | : : | |

### AMENDED COMPLAINT-CIVIL ACTION

Plaintiff, QVC, Inc., by and through its undersigned counsel, hereby complain of defendants,

Stacey Schieffelin and David Schieffelin, jointly and severally, and defendant, Models Prefer Ltd , as

follows:

### PARTIES

1       Plaintiff, QVC, Inc ("Plaintiff"), is a corporation organized and existing under the

laws of the State of Delaware with its principal place of business located at Studio Park, 1200

Wilson Drive, West Chester, Pennsylvania 19380

2     Defendant, Stacey Schieffelin, is an adult individual residing and domiciled in the State of Connecticut with business offices located at 567 S. Leonard Street, #1, Waterbury, Connecticut 06708

3     Defendant, David Schieffelin, is an adult individual residing and domiciled in the State of Connecticut with business offices located at 567 S. Leonard Street, #1, Waterbury, Connecticut 06708

4     Defendant, Models Prefer, Ltd., is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at 567 S. Leonard Street, #1, Waterbury, Connecticut 06708. (The defendants Stacey Schieffelin and David Schieffelin, jointly and severally, and the defendant Models Prefer, Ltd. hereinafter are referred to collectively as "Defendants," unless stated otherwise).

5     At all times material hereto, Defendants acted by and through their agents, employees, servants and representatives, actual or apparent, any and all of who were acting, or purporting to act, within the course and scope of their authority, agency duties and/or employment

### VENUE AND JURISDICTION

6     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States

7     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events or omissions giving rise to Plaintiff's claims and request for declaratory and injunctive relief occurred in this judicial district and/or in that the parties contractually agreed to the selection of this judicial district as the appropriate venue for the within civil action

2

## SUBSTANTIVE ALLEGATIONS

8    Plaintiff is a general merchandise electronic retailer that markets and distributes a wide variety of products directly to consumers through, among other things, its merchandise-focused, direct response television programming.

9    Defendants are in the business of promoting, marketing, distributing and selling health and beauty products under the trademark and trade name of "Models Prefer" (collectively, the "Products")

10    The defendants Stacey Schieffelin and David Schieffelin, jointly and severally, and Plaintiff entered into a certain agreement (the "Agreement"), dated as of April 1, 1998, pursuant to Section 1(a) of which Defendants granted Plaintiff

> the exclusive worldwide right to Promote [defined by the Agreement to be promote, advertise, market, sell and distribute] the Products [defined by the Agreement to be all health and beauty products under the trademark and trade name of "Models Prefer"] through all means and media, including, without limitation, Electronic Media (which, for purposes of this Agreement, shall mean all electronic transmissions, whether now in existence or developed hereafter, through which a consumer is requested to purchase any product by mail, telephone or other electronic means, including without limitation, televised electronic retailing programs, infomercials, direct response commercial spots and computerized shopping services, whether on-line services or otherwise)

11.    The defendant Models Prefer Ltd. was incorporated on or about September 17, 2002 and, commencing on a date thereafter, Defendants' business transactions with Plaintiff were conducted, in whole or in part, by and through the corporate defendant Models Prefer Ltd

12    The Agreement provides that Plaintiff, from time to time, may issue to Defendants consignment orders for Products, substantially in the form appended as Exhibit 1 to the Agreement Each such consignment order is incorporated by reference into the agreement, except that, in the

3

event of any inconsistency between the terms of each such consignment order and the terms of the

Agreement, the Agreement shall govern  From a date commencing on or after September 17, 2002,

such consignment orders were issued to Defendants by and through "Models Prefer, Ltd."

13    Provided that, in accordance with the requirement set forth in Section 2(b) of the

Agreement, a Product appeared on the direct response television programming produced by Plaintiff

or one of its affiliates (the "Programs") no later than December 31, 1998, which condition Plaintiff

satisfied, Paragraph 2(a) of the Agreement, in relevant part, provides that the term of the Agreement

shall be as follows:

> 2. Term
>
> (a) Generally  Subject to Section 2(b) hereof, the initial term of this
> Agreement (the 'Initial Term') shall commence on the date hereof and shall
> expire after the date of this Agreement  Upon the expiration of the Initial
> Term, this Agreement shall automatically and continually renew for
> successive additional one (1) year terms (each a 'Renewal Term' and the
> Initial Term and each Renewal Term each being referred to herein as a
> 'Term') unless (i) [Defendants] notif[y] QVC in writing, at least thirty (30)
> days prior to the end of a Term, of its intent to terminate the Agreement, and
> (ii) during such Term, Net Retail Sales of such Products are in the aggregate
> less than the Minimum Amount [for such Term]   . . For purposes of this
> Agreement, 'Net Retail Sales' shall mean the gross sales price paid by
> customers of [Plaintiff] or its affiliates for Products, exclusive of any (i) sales,
> use, excise or value-added taxes, (ii) credits, returns, discounts, settlements or
> other allowances, (iii) customs duties, tariffs or similar import impositions
> due from [Plaintiff] or its affiliates, (iv) shipping and handling charges and
> (v) all fees due from [Plaintiff] or its affiliates for licenses, registrations and
> approvals necessary for the importation and promotion of the Products

14    Provided that the Net Retail Sales are equal to, or exceeds, the Minimum Amount for

each Renewal Term, the Agreement is automatically renewed for an additional Renewal Term at an

increased Minimum Amount  The Agreement will continue to so automatically renew for additional

Renewal Terms unless terminated by Plaintiff or Defendants pursuant to the express procedures, and

under the terms and conditions, set forth in Section 2(a) of the Agreement

4

15.    Pursuant to Section 2(a) of the Agreement, neither Plaintiff nor Defendants may terminate the Agreement except upon no less than thirty (30) days prior to the expiration of the end of a Renewal Term and then only where the Net Retail Sales are less than the applicable Minimum Amount for such Renewal Term

16    Section 3 of the Agreement provides as follows with respect to the obligations of defendant, Stacey Schieffelin, to appear on the Programs during the Term of the Agreement to assist Plaintiff in the Promotion of the Products:

> 3.    Appearances    If requested by [Plaintiff] and subject to her reasonable availability, Stacey Schieffelin shall make Appearances on Programs. For purposes of this Agreement, an 'Appearance shall mean the personal appearance by Stacey Schieffelin during a one - (1) to three – (3) day period on Programs in which Products may be offered for sale   Unless otherwise determined by [Plaintiff], all Appearances shall take place at [Plaintiff's] studios in West Chester, Pennsylvania   [Plaintiff] makes no representations or warranties with respect to the number of Appearances, if any, that it may request Mrs. Schieffelin to make    [Defendants] [acknowledge] that each Appearance will be on live, unscripted television and as consequence thereof, [Defendants] shall have no prior right of approval over the content of Mrs Schieffelin's Appearances  At [Plaintiff's] request and subject to her reasonable availability, Mrs  Schieffelin shall attend rehearsals and production meetings in connection with the Appearances  The dates, time and location of such rehearsals and meetings shall be on the dates on which Mrs  Schieffelin makes an Appearance or on other dates mutually agreed to between [Defendants] and [Plaintiff]

17.    Section 4 of the Agreement provides, in relevant part, that "[Defendants] shall not promote or endorse any consumer goods (including, without limitation, the Products) by means of Electronic Media during any Term and for one (1) year after the expiration or termination of this Agreement "

18    Section 4 of the Agreement further provides that Defendants' non-competition obligations survive termination of the Agreement.

5

19      The defendants Stacey Schieffelin and David Schieffelin, jointly and severally, and Plaintiff entered into an Amendment to Agreement, dated as of April 24, 1999 (the "Amendment") pursuant to which Defendants agreed to provide, at their sole expense, as and when requested by Plaintiff, training for Plaintiff's telemarketing personnel with respect to the Products and photography for Product packaging and promotional materials  (The Agreement and the Amendment hereinafter are referred to collectively as the "Agreement")

20      Plaintiff met the required Net Retail Sales amount for the Initial Term and, therefore, the Agreement renewed on April 1, 2000 for a Renewal Term expiring on April 1, 2001

21      Plaintiff thereafter has met the required Net Retail Sales amount to renew the Agreement for each and every Renewal Term up through and including the current Renewal Term that will expire on April 1, 2007

22      As Plaintiff has met the requisite Net Retail Sales for the Renewal Term that will end on April 1, 2007, the Agreement will renew on April 1, 2007 for an additional Renewal Term to expire on April 1, 2008  Consequently, the Agreement, by its terms, cannot be  terminated by Defendants any earlier then as of April 1, 2008 and then only if the Net Retail Sales for the Renewal Term that will expire on April 1, 2008 is less than the applicable Minimum Amount for such Renewal Term

23      ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████



26     

28     Plaintiff has satisfied all of its obligations under the Agreement

## COUNT I

29     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28 inclusive as if set forth fully at length herein

31     The aforesaid case or controversy is a substantial controversy between adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment

32. The value of the Agreement for the current Renewal Term and the Renewal Term expiring on April 1, 2008 each exceeds the sum of $150,000 00, exclusive of interests and costs



35. Declaratory judgment to determine the parties' respective rights and interests is an appropriate remedy under the circumstances

WHEREFORE, plaintiff, QVC, Inc., demands entry of a declaratory judgment in its favor and against defendants, Stacey Schieffelin and David Schieffelin, jointly and severally, and defendant, Models Prefer Ltd , (a) determining and declaring that the defendants' purported notice of termination did not terminate the Agreement; (b) determining and declaring that the Agreement, including, without limitation, the defendants' non-competition obligations thereunder, remains in full force and effect; (c) determining and declaring that, as a result of Defendants' continuing conduct intended to thwart Plaintiff's ability to perform under the Agreement, the Agreement shall be deemed renewed for an additional Renewal Term ending on April 1, 2009 absent a resolution of the within matter no later than April 1, 2008, the commencement date for the next Renewal Term; (d) awarding costs; and

8

(e) granting such other and further relief as the Court deems just and proper

## COUNT II

36.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28 inclusive as if set forth fully at length herein

37    ████████████████████████████████████████████████████████████

████████████████████████████████████ent

38    By virtue of the foregoing, Plaintiff has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants

39    Unless Defendants are enjoined from breaching Plaintiff's exclusive rights and license, Plaintiff will be irreparably harmed by:

    (a)    Loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

    (b)    A threat to the enforcement of reasonable contracts; and

    (c)    Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable

40.    Plaintiff has no adequate remedy at law.

WHEREFORE, plaintiff, QVC, Inc., demands that this Court enter judgment in its favor and against defendants, Stacey Schieffelin and David Schieffelin, jointly and severally, and defendant, Models Prefer Ltd , (a) permanently enjoining the defendants from promoting, marketing, selling, or distributing (or otherwise causing a third party to promote, market, sell, or distribute) any Products to any party other than QVC or any of its affiliates during the Term of the Agreement and for a period of one (1) year following the valid expiration or termination of the Agreement in accordance with its terms; (b) permanently enjoining the defendants from granting any license or rights to any

third party that infringes upon the exclusive rights and license granted to the plaintiff under the Agreement; (c) permanently enjoining and compelling the defendants to deliver and sell Products by consignment exclusively to Plaintiff during the Term of the Agreement in accordance with the terms and conditions of the Agreement; (d) permanently enjoining the defendants from seeking to terminate the Agreement effective on any date prior than April 1, 2008 and then only in accordance with, and subject to, the terms and conditions of the Agreement; and (d) granting such other and further relief as the Court deems just and equitable

## COUNT III

41    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28 inclusive as if set forth fully at length herein

42    ████████████████████████████████████████████████████████████ ██████████████████████████████.

43    By virtue of the foregoing, Plaintiff has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants

44    Unless Defendants are enjoined from breaching their non-competition obligations due and owing to Plaintiff, Plaintiff will be irreparably harmed by:

    (a)    Loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

    (b)    A threat to the enforcement of reasonable contracts; and

    (c)    Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable

45    Plaintiff has no adequate remedy at law.

WHEREFORE, plaintiff, QVC, Inc , demands that this Court enter judgment in its favor and against defendants, Stacey Schieffelin and David Schieffelin, jointly and severally, and defendant, Models Prefer Ltd , (a) permanently enjoining the defendants from promoting or endorsing any consumer goods (including, without limitation, the Products) by means of Electronic Media, as defined in the Agreement, during any Term of the Agreement and for one (1) year after the valid expiration or termination of the Agreement in accordance with its terms; and (b) granting such other and further relief as the Court deems just and equitable

### COUNT IV

46      Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28 inclusive as if set forth fully at length herein

47      ██████████████████████████████████████████████████████████ons o██████████████████████████████████████████████████████████████

48      ██████████████████████████████████████████████████████████ a██████████████

49      Plaintiff, at this time, has an inventory of the Products with an aggregate retail value of no less than $1,096,432.25

50      The anticipated profits from the sale of the aforesaid inventory is no less than $150,000 00

51      ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

11

52    ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

WHEREFORE, plaintiff, QVC, Inc , demands judgment in its favor and against defendants, Stacey Schieffelin and David Schieffelin, jointly and severally, and defendant, Models Prefer Ltd , (a) in the amount of no less than $150,000 00, together with pre-judgment interest and such costs as allowed by law; and (b) granting such other relief as the Court may deem appropriate and proper

### COUNT V

53    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 28 inclusive as if set forth fully at length herein

54    ██████████████████████████████████████████████████████████████

████████████████████████████████████

55    Plaintiff is entitled to an accounting of any and all proceeds, earnings and profits earned by Defendants in breach of the Agreement

56    Plaintiff is entitled to have the aforesaid proceeds, earnings and profits disgorged and remitted to Plaintiff

57    Defendants, for the reasons described above, are each a constructive trustee for the benefit of Plaintiff of all such proceeds, earnings and profits, with all attendant fiduciary responsibilities and obligations thereof

WHEREFORE, plaintiff, QVC, Inc , demands judgment in its favor and against defendants, Stacey Schieffelin and David Schieffelin, jointly and severally, and defendant, Models Prefer Ltd., (a) directing the defendants to account for any and all proceeds, earnings and profits derived from any

12

and all promotion, marketing, sale, or distribution (whether directly or through any third party) of any and all Products in breach of the obligations owing to the plaintiff under the Agreement; (b) directing that the defendants are each a constructive trustee for the benefit of the plaintiff of any and all such proceeds, earnings and profits, with all attendant fiduciary responsibilities and obligations thereof; (c) directing the defendants to disgorge any and all such proceeds, earnings and profits and directing that such proceeds, earnings and profits to remitted to the plaintiff; and (d) granting such other and further relief as the Court deems just and equitable

SAUL EWING LLP
A Delaware Limited Partnership

By: _____
Nathaniel Metz, Esquire
(Signature Validation No  NM264)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-8385
(215) 972-2282 (Telefacsimile)
nmetz@saul com

Dated:  October 26, 2006              Attorneys for Plaintiff QVC, Inc

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Memorandum of Law in Support of Motion to Dismiss Amended Complaint and to Strike Paragraphs of Amended Complaint for Violation of FRE 408** has been filed electronically and is available for viewing and downloading on the Electronic Case Filing System of the United States District Court for the District of Pennsylvania. I further certify that I am causing a true and correct copy of this document to be on served on this 17th day of November, 2006 by first class United States mail, postage prepaid, upon the following counsel of record for Plaintiff:

> Nathaniel Metz, Esquire
> Saul Ewing LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA  19102-2186

/s/ Antoinette R. Stone (3519) _____