IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QVC, INC., | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| STACEY SCHIEFFELIN, DAVID SCHIEFFELIN and MODELS PREFER, LTD., | : : : | No. 06-cv-4231 |
| Defendants. | : | The Honorable Thomas N. O'Neill, Jr. |
| | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF PLAINTIFF QVC, INC. FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

**INTRODUCTION**

At the same time that QVC, Inc. ("QVC") submitted its opposition to Defendants' Motion to Dismiss the First Amended Complaint for, among other things, lack of subject matter jurisdiction, QVC moved for leave to file a Second Amended Complaint. QVC's Motion for Leave should be denied because the proposed amendment would be futile and is proffered in bad faith. Indeed, not only has QVC failed to cure (and cannot cure) the fatal defects in its First Amended Complaint, but QVC's proposed Second Amended Complaint suffers from even greater defects. In particular:

1. Just as QVC's First Amended Complaint fails to plead a justiciable "case or controversy," so too does the proposed Second Amended Complaint;

2. To the extent QVC is attempting to add a tortious interference claim against Models Prefer, Ltd. ("MPL"), QVC has failed to state a claim for relief; and

3. To the extent that QVC purports to plead ownership rights in the "Models Prefer" trademarks or trade name, those claims must fail.

For these reasons, which are set forth in greater detail below, there is no basis upon which this Court should grant QVC leave to amend its baseless Complaint a second time.

## FACTS AND PROCEDURAL HISTORY

QVC instituted this action against Stacey and David Schieffelin and MPL (collectively, "Defendants") on the sole basis of a letter that Defendants' counsel sent to QVC setting forth a settlement proposal (the "Settlement Letter"). *See* September 12, 2006 letter from S. Blinkoff to QVC, a true and correct copy of which is attached hereto as Exhibit "A." In its original and First Amended Complaint, QVC contends that the Settlement Letter is in actuality an unequivocal "termination notice" purporting to end the written agreement between the Schieffelins and QVC (the "Contract"). Compl., para. 23; First Am. Compl., para. 23.

The Settlement Letter responded to a request from QVC's in-house counsel to propose how the parties' business relationship might proceed under terms different than those stated in the Contract. However, instead of responding "yea" or "nay" to the proposal , QVC chose to start litigation on the fallacious premise that the Settlement Letter, which QVC itself had solicited and which contemplated the execution of a new agreement with modified terms, represented an intent by the Defendants to breach the existing Contract.

In keeping with its apparent determination to shoot first and ask questions later, it was only *after* it commenced this lawsuit that QVC demanded assurances from the Defendants that they were not engaging in, and had no plans to engage in, any conduct that would be in breach of the Contract. *See* letter dated September 25, 2006 from N. Metz to S. Blinkoff, a true and correct copy of which is attached hereto as Exhibit "B." Defendants promptly responded by not only assuring QVC that they were not engaged in such conduct, but by also confirming that the "smoking gun" Settlement Letter was in fact intended to be nothing more than a proposal for the

*amicable* termination of the existing Contract in favor of a new agreement with mutually acceptable terms. *See* letter dated September 27, 2006, from A. Stone to N. Metz, a true and correct copy of which is attached hereto as Exhibit "C." Thus, if any confusion existed about the Defendants' intentions, this exchange made it clear that the Settlement Letter was not a "signal" of an intent to breach, but instead was an expression of the Defendants' interest in "working with QVC, in good faith, to arrive at a sensible and fair adjustment of the parties' relationship." *Id.*

If the Defendants had intended the Settlement Letter to constitute a termination of the contract, there would have been no reason for them to refer two weeks later to adjusting the parties' relationship. Once terminated, there would have been no relationship to adjust. That being the case, reason would dictate that QVC then would have withdrawn the complaint and the parties would have set about determining whether they could settle their differences. Indeed, once QVC received unequivocal assurances that the Settlement Agreement constituted a settlement proposal, there was no basis for the complaint, because a real case or controversy plainly did not exist. However, QVC did not withdraw its complaint, apparently believing that the pendency of litigation would give it additional leverage in settlement negotiations with the Defendants. Defendants then moved to dismiss the First Amended Complaint, arguing, *inter alia*, that (1) the Court lacks jurisdiction over the action for want of a genuine and justiciable case or controversy; and (2) QVC cannot base its claims upon a settlement proposal.

Instead of immediately responding to the Motion to Dismiss, QVC requested a series of five stipulations to extend the response deadline. QVC purportedly asked for these stipulations, to which Defendants agreed, in order to engage in "serious and earnest discussions" regarding resolution of this case. Suddenly and without warning, however, QVC ceased these discussions and filed a memorandum opposing the Motion. QVC also filed a motion seeking leave to file a

Second Amended Complaint and to assert a new claim against MPL. Tellingly, however, the proposed Second Amended Complaint asserts no additional factual basis for QVC's previously existing claims, but instead continues to rely solely upon statements in the Settlement Letter. Likewise, QVC's new claim against MPL for "tortious interference" also rests upon the Settlement Letter. Finally, the proposed Second Amended Complaint appears to allege that the Contract - which grants certain distribution and marketing rights - actually conveyed to QVC more expansive ownership interests in the Models Prefer trademarks and/or trade name. For the reasons set forth below, all of these allegations fail as a matter of law, rendering any further amendment futile, and QVC proffers its Second Amended Complaint in bad faith.

## ARGUMENT

A motion for leave to amend pleadings is governed by the generous standard established in *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, while the standard is generous, the right to amend is not limitless. Here, not only is the proposed amendment motivated by bad faith, but it also would be futile. Accordingly, leave should be denied. *See, e.g., id.* at 182 ("In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of amendment, futility of amendment, etc. - the leave should, as the rules require, 'be freely given'."); *Cummings v. Office of Catholic Ed.*, No. Civ. A. 05-104, 2005 WL 1124103 at *1 n.1 (E.D. Pa. May 11, 2005) (stating leave to amend would not have been granted because amendment would be futile).

### I.   QVC's Proposed Second Amended Complaint Does Not Cure the Jurisdictional Defects

In its proposed Second Amended Complaint, QVC makes no effort to cure the jurisdictional defects of its First Amended Complaint. The proposed amendment is still

4

premised upon a letter conveying a settlement proposal. QVC makes no new allegations of purported "termination," "breach," or any actionable conduct. The proposed amendment alleges no new facts that would turn this matter into a genuine or justiciable case or controversy. Indeed, QVC admits that "the proposed Second Amended Complaint is based on the same set of operative facts which governed the previous complaint." *See* QVC Mem. at 22-23.

Because the proposed Second Amended Complaint is based upon the same factual underpinning as the existing First Amended Complaint, it suffers from the same jurisdictional defects already raised and briefed in Defendants' Motion to Dismiss. *See* Motion to Dismiss and supporting materials, all of which are incorporated herein by reference. Accordingly, further amendment should be denied.

## II. Even if QVC's Proposed Second Amended Complaint Were Not Plagued by Jurisdictional Defects and Proffered in Bad Faith, It Still Fails to State a Claim Upon Which Relief May Be Granted

Although there are minor "wordsmithing" changes, the primary difference between the First Amended Complaint and the proposed Second Amended Complaint is the addition of a claim for tortious interference with contract. In particular, QVC alleges:

> 13. Section 5(e) of the Agreement provides that the Agreement shall be binding not only upon the Schieffelins, but also their "heirs, representatives, successors and assigns."
>
> 14. MPL is bound by the provisions of the Agreement as the agent and representative of the Schieffelins.
>
> * * *
>
> 31. On September 12, 2006, Defendants sent a purported notice of termination of the Agreement to Plaintiff. . . .
>
> * * *
>
> 36. Defendants' purported termination of the Agreement is invalid. Defendants' purported notice of termination does not, and cannot,

5

>    terminate the Agreement in accordance with the terms and conditions
>    thereof. . . .
>
>                                      * * *
>
>    40.   The conduct of MPL in purportedly terminating the Agreement constitutes
>          purposeful actions intended to harm the contractual relationship under the
>          Agreement, which contractual relationship was valid and known to MPL.
>
>    41.   The conduct of MPL constitutes purposeful actions intended to harm the
>          contractual relationship under the Agreement.
>
>    42.   There exists no justification or privilege for MPL's conduct as described
>          above.

It is black letter law that a defendant cannot tortiously interfere with its own contract. *Maier v. Maretti*, 448 Pa. Super. 276, 288-89, 671 A.2d 701, 707 (1996) (holding that recovery on a theory of tortious interference requires a contractual relationship between the plaintiff and a party other than the defendant). In its proposed Second Amended Complaint, QVC has alleged that since September 17, 2002, the Schieffelins have performed under the Contract "by and through MPL acting as the representative and agent for the Schieffelins" and, as the "agent and representative of the Schieffelins," MPL is bound by the terms of the Contract. *See* Sec. Am. Cmpl. ¶¶ 12, 14. Therefore, even accepting as true for present purposes that the Settlement Letter was an unequivocal termination notice and that MPL participated in the termination, this conduct cannot give rise to a claim of tortious interference as a matter of law. Simply stated, the alleged conduct, even if accepted as true, is not actionable.

Moreover, QVC has failed to plead facts that would support the naked legal conclusion that MPL's alleged conduct was not justified - another requisite element of a tortious interference claim. *See, e.g., Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (affirming dismissal under Rule 12(b)(6) and reminding that a court "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"). To the contrary, the facts

6

actually pled demonstrate that MPL's alleged conduct, assuming such allegations are true, *was* justified. *See, e.g., Advent Systems Limited v. Unisys Corp.*, 925 F.2d 670 (3d Cir. 1991) (affirming that parent corporation was justified in instructing its subsidiary not to enter into a contract with the plaintiff because the software system to be developed under the contract would compete with a product that the parent corporation had developed); *Green v. Interstate United Management Servs. Corp.*, 748 F.2d 827 (3d Cir. 1984) (holding parent corporation's instructions to its subsidiary not to execute a tendered lease were justified and did not give rise to tortious interference).

QVC's proposed Second Amended Complaint fails to plead a claim for tortious interference as a matter of law, and leave to amend should be denied.

### III.    QVC Has No Ownership Interest in the Models Prefer Trademarks

The other notable change in QVC's proposed Second Amended Complaint is a reference to MPL's registration of the Models Prefer trademarks with the United States Patent and Trademark Office (the "USPTO"). Specifically, QVC adds the following allegation: "On a date or dates after September 17, 2002, MPL became the registered owner or assignee of the trademarks 'Models Prefer' and 'Model's Prefer.' Any right, title or interest in such trademarks on the part of MPL, however, is subject to the license previously granted to Plaintiff under the Agreement and to Plaintiff's exclusive marketing rights under the Agreement." *See* Sec. Am. Compl. ¶ 18.

Until this new proposed paragraph 18, QVC had referred to the Contract as the "Agreement," with a capital "A." In this proposed paragraph, however, QVC uses a new term - "license" - and tosses out concepts like "title" to the Models Prefer trademarks. To the extent that QVC is purporting to claim ownership of the Models Prefer trademarks, that claim must fail.

7

Nowhere in its terms does the Contract purport to convey title of the Models Prefer trademarks to QVC. Rather, the Contract is clear that the <u>only</u> right granted to QVC vis-à-vis "health and beauty products marketed under the trademark MODELS PREFER" is the right to "promote, advertise, market, sell and distribute" products under that name. *See* Contract Preamble and Section 1(a), a true and correct copy of which has been submitted with Defendants' motion to dismiss papers. Distribution and promotion are wholly separate from *ownership* of the Models Prefer trademarks and the right to make and package products bearing the Models Prefer name.

Because the Schieffelins owned the trademarks and trade name MODELS PREFER at the time the Contract was executed, and because nothing in the Contract conveyed that ownership to QVC, QVC can have no claim to those rights. *See, e.g., Trianco, LLC v. International Business Machines Corp.*, 466 F. Supp.2d 600, 604 (E.D. Pa. 2006) ("Dismissal is appropriate where the terms of a contract included in the complaint contradict the allegations in the complaint."); *Feick v. Fleener*, 653 F.2d 69, 75 (2d Cir. 1981) ("Since the documents upon which appellants based their claim show on their face absence of any grounds for relief, dismissal was proper."); *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp.2d 179, 184 (S.D.N.Y. 2000) (granting defendant's motion to dismiss where "the documents contradict Plaintiffs' allegations.").

## IV. QVC Proffered Its Second Amended Complaint In Bad Faith

Finally, QVC's sudden decision to cut off all discussions and instead seek leave to assert yet one more baseless claim against MPL appears to be an attempt to pressure the Schieffelins to capitulate to a settlement on QVC's terms. This is a bad faith use of the procedural rules. Indeed, it is the same device QVC attempted to employ by commencing this lawsuit in the first instance - to create a fire where none exists. These tactics work to Defendants' prejudice, as

Defendants must now expend additional resources to move to dismiss the new complaint in litigation that was baseless from the get-go.

## CONCLUSION

For all of the foregoing reasons, QVC's Motion for Leave to file a Second Amended Complaint should be denied, and this action should be dismissed in its entirety.

Respectfully submitted,

BROWN STONE NIMEROFF LLC

By: _____
Antoinette R. Stone (Pa.Id.No. 23464)
(Signature Validation No. ARS3819)
1818 Market Street
Suite 2300
Philadelphia, PA 19103
(267) 861-5330
(267) 350-4090 (fax)

Attorneys for Defendants Stacey Schieffelin, David Schieffelin and Models Prefer, Ltd.

Dated: March 29, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Memorandum of Law in Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint** has been served by first class United States mail, postage prepaid, this 29th day of March, 2007 upon the following counsel of record for Plaintiff:

>Nathaniel Metz, Esquire
>Saul Ewing LLP
>Centre Square West
>1500 Market Street, 38th Floor
>Philadelphia, PA 19102-2186

>_____
>Antoinette R. Stone

# EXHIBIT A

Case 2:06-cv-04231-TON   Document 24   Filed 03/29/2007   Page 11 of 20

# Buchanan Ingersoll & Rooney PC

One Chase Manhattan Plaza
35th Floor
New York, New York 10005
T 212 440 4400
F 212 440 4401
www.buchananingersoll.com

**Sharon Blinkoff**
212 440 4475
sharon.blinkoff@bipc.com

*SETTLEMENT OFFER - CONFIDENTIAL*
*PURSUANT TO FRE 408*

September 12, 2006

**Via Facsimile and Regular Mail**

Larry Hayes, Esq.
Legal Department
QVC Inc
1365 Enterprise Drive
West Chester, PA 19380

Re:     **MODELS PREFER LTD.**

Dear Larry:

Further to our conversation last Friday, I have set forth below our proposed business terms governing the cessation of business between our clients, Models Prefer Ltd. and David and Stacey Schieffelin, and QVC US. For good orders sake, this also serves as formal notice of our client's termination of any outstanding agreements with QVC US.

A simple review of the history of my client's business in the US shows that the frequency and placement of air time of my client on QVC US has been drastically eroded, which has resulted in a significant decline in sales volumes of Models Prefer's products. In fact, my client's last on-air date this year was in June. There are no dates scheduled for the balance of this year or for 2007. Even more significant, there is no TSV date scheduled for 2007. Clearly QVC US has withdrawn its support of Models Prefer. Hence, this termination should come as no surprise to QVC US.

Notwithstanding severance of my client's relations with QVC US, they would like to continue a relationship with QVC UK. But, for my clients to proceed with the QVC UK, which we believe is in the best interests of all concerned, we have to develop an alternate distribution venue in the US to support the volumes of orders from QVC UK. The intention of my client is to pursue classic retail opportunities, as well as Internet sales. While my client may consider infomercials, it has no intention of moving to HSN at this time.

QVC Inc.
September 12, 2006
Page - 2 -

With the above in mind and provided that the termination with QVC US is amicable, my client's business proposal is as follows:

1. Models Prefer Ltd. takes back all outstanding inventory with QVC US, which at QVC US's cost is approximately $450,000.00. This does not represent a liability to QVC US since QVC US takes my client's product on a <u>consignment basis</u> and has not yet paid for this inventory. What we propose is that my client take physical control over the inventory and accept a return from QVC US's warehouse.

2. Models Prefer Ltd. assumes QVC US's obligation to fulfill continuity orders.

3. Models Prefer Ltd. agrees not to sell product on HSN for a twelve month period commencing on June 15th, the last on-air date of my client's products on QVC US.

4. Models Prefer Ltd.'s principle, Stacey Schieffelin, agrees not to appear on HSN for a twelve month period commencing on June 15th, Ms. Schieffelin's last on-air date on QVC US.

5. The parties exchange mutual releases.

Again, as I have discussed with David Lancelot, assuming the above is acceptable, my clients are prepared to move forward with the QVC UK contracts that Mr. Lancelot has circulated. Please understand that the foregoing proposal represents our confidential proposed settlement terms and is not to be used for any other purposes or be deemed an admission of any nature or sort or to be admissible in any proceedings should such arise.

For reasons which I am sure you can understand we need to conclude this matter quickly. Specifically, if QVC US is unwilling to agree to the proposal outlined above, Models Prefer will consider all available options. However, we believe the above is incredibly fair, and therefore, look forward to your cooperation in working towards an amicable cessation. Accordingly, I would like to see if we can wrap this up this week on the terms outlined above.

I await your prompt response.

Sincerely,

Sharon Blinkoff

SAB/ksk

cc: David Schieffelin (Models Prefer Ltd.)

#342582-v1

# EXHIBIT B



SAUL
EWING
Attorneys at Law
A Delaware LLP

Nathaniel Metz
Phone: (215) 972-8385
Fax: (215) 972-2282
nmetz@saul.com
www.saul.com

September 25, 2006

*via ELECTRONIC TRANSMISSION*
*and OVERNIGHT DELIVERY*

Sharon Blinkoff, Esquire
Buchanan Ingersoll & Rooney PC
One Chase Manhattan Plaza, 35th Floor
New York, New York 10005

        **RE:**   **QVC, Inc. v. Models Prefer Ltd.,** *et al.*
              **U.S.D.C., E.D.Pa., C.A. No. 06-cv-04231(TON)**

Dear Ms. Blinkoff:

      As you are aware, this law firm represents QVC, Inc. ("QVC") in regard to the above-captioned civil action and the underlying issues pertaining to an agreement, dated as of April 1, 1998 (as amended on April 29, 1999) between and among, Stacey Schieffelin and David Schieffelin, jointly and severally, on the one hand, and QVC, on the other hand (the "Agreement"). Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement. The Agreement grants certain exclusive rights and licenses to QVC, in addition to imposing certain non-competition obligations upon Models Prefer.

      I am in receipt of your letter, dated September 12, 2006 (the "September 12th Letter"), directed to QVC by you on behalf of Stacey Schieffelin, David Schieffelin and Models Prefer Ltd., a corporation wholly owned by them and through which they are transacting business. (Stacey Schieffelin, David Schieffelin and Models Prefer Ltd. hereinafter are referred to collectively as "Models Prefer" or "Vendor," unless stated otherwise). The Agreement, of course, grants certain exclusive rights and licenses to QVC, in addition to imposing certain non-competition obligations upon Models Prefer. The September 12th Letter purports to terminate the Agreement effective as of September 12, 2006. For the reasons set forth below, the

Centre Square West ♦ 1500 Market Street, 38th Floor ♦ Philadelphia, PA 19102-2186
Phone: (215) 972-7777 ♦ Fax: (215) 972-7725

BALTIMORE   CHESTERBROOK   HARRISBURG   NEWARK   PHILADELPHIA   PRINCETON   WASHINGTON   WILMINGTON
A DELAWARE LIMITED LIABILITY PARTNERSHIP

Sharon Blinkoff, Esquire
September 25, 2006
Page 2

September 12th Letter cannot act to so terminate the Agreement and any such asserted termination, on its face, is invalid.

The current Renewal Term under the Agreement commenced on April 1, 2006. By its express terms, the Agreement can be terminated only upon thirty days notice prior to the end of a Renewal Term and ***then only where the Net Retail Sales are less than the applicable Minimum Amount for such Renewal Term***:

> Upon the expiration of the Initial Term, this Agreement shall automatically and continually renew for successive additional one (1) year terms (each a 'Renewal Term' and the Initial Term and each Renewal Term each being referred to herein as a 'Term'), unless (i) Vendor notifies QVC in writing, at least thirty (30) days prior to the end of a Term, of its intent to terminate the Agreement, and (ii) during such Term, Net Retail Sales of Products are in the aggregate less than the Minimum Amount.

Agreement, § 2(a). At this juncture, there are almost six and one half months remaining in the current Renewal Term. Unless QVC fails to meet the requisite amount of the Net Retail Sales for this Renewal Term, the Agreement will renew for an additional Renewal Term to expire on April 1, 2008. While the conduct of Models Prefer in this matter has prejudiced severely QVC's efforts to meet the requisite Retail Net Sales for this Renewal Term, the Agreement nonetheless grants QVC until April 1, 2007 to do so. Your purported termination of the Agreement as of September 12, 2006, accordingly, is invalid and the Agreement remains in full force and effect.

The September 12th Letter states that "[t]he intention of [Models Prefer] is to pursue classic retail opportunities, as well as Internet sales." The September 12th Letter further states that Models Prefer "may consider infomercials[.]" Any and all such conduct involving the Products or Electronic Media is in violation of the provisions of the Agreement.

Section 1(a) of the Agreement grants the following exclusive rights and license to QVC to Promote the Products for the Term of the Agreement:

> (a) <u>Marketing Rights</u>. QVC shall have the exclusive worldwide right to Promote the Products through all means and media, including, without limitation, Electronic Media (which, for purposes of this Agreement, shall mean all electronic transmissions, whether now in existence or developed hereafter, through which a consumer is requested to purchase any product by mail, telephone or other electronic means, including, without limitation, televised electronic retailing programs, infomercials, direct response commercial spots and computerized shopping services, whether on-line services or otherwise).

Sharon Blinkoff, Esquire
September 25, 2006
Page 3

Section 4 of the Agreement mandates that "Vendor shall not promote or endorse any consumer goods (including, without limitation, the Products) by means of Electronic Media during any Term and for one (1) year after the expiration or termination of this Agreement."

In light of the September 12th Letter, and the statements set forth therein, QVC is compelled to demand the written assurances of Models Prefer that

(1)   Models Prefer is not, has not and will not Promote any Products in violation of the exclusive rights and license granted to QVC under the Agreement; and

(2)   Models Prefer is not, has not and will not promote or endorse any consumer goods (including, without limitation, the Products) by means of Electronic Media in violation of the non-competition provisions set forth in Section 4 of the Agreement.

QVC also demands that Models Prefer acknowledge, in writing, the invalidity of the purported termination of the Agreement sought by the September 12th Letter and, furthermore, that Models Prefer will honor their obligations to QVC under the Agreement.

Absent receipt of the above requested written assurances and acknowledgements no later than 5:00 p.m. (EDT) on September 27, 2006, QVC will proceed to enforce its rights through such means as deemed necessary to protect its interests, including, without limitation, a request for judicial intervention and immediate injunctive relief, all without further notice to you except as required by law. In the interim, QVC reserves all of its rights and remedies.

Thank you for your prompt attention to this matter.

Very truly yours,

NATHANIEL METZ

NM/dge
cc:   Lawrence R. Hayes, Esquire, Vice President/Legal
       Michael R. Greco, Esquire

# EXHIBIT C

# Buchanan Ingersoll & Rooney PC
Attorneys & Government Relations Professionals

**Antoinette R. Stone**
215 665 3819
antoinette.stone@bipc.com

1835 Market Street
14th Floor
Philadelphia, PA  19103-2985
T 215 665 8700
F 215 665 8760
www.buchananingersoll.com

September 27, 2006

*via PDF and regular mail*

Nathaniel Metz, Esquire
Saul Ewing LLP
Centre Square West
1500 Market St., 38th Floor
Philadelphia, PA 19102-2186

    Re:    **QVC, Inc. v. Models Prefer Ltd, et al.**
             **C.A. No. 06-cv-04321 (USDC, EDPa)**

Dear Sandy :

    As you know, I am representing the defendants in the above-referenced action. This letter is in response to your letter of September 25, 2006, addressed to Sharon Blinkoff.

    I understand from your letter that you object to the notice of termination contained in Ms. Blinkoff"s letter of September 12, 2006. Although I do not agree with your interpretation of the termination provision in the parties' contract, or your characterization of my clients' "conduct" vis-à-vis QVC, I see no need to focus on our differing interpretations at this point. You may know that Ms. Blinkoff sent her letter in response to Mr. Larry Hayes' invitation to her to submit a proposal to resolve the dispute between the parties arising out of the contract regarding the Models Prefer product line. The intent of her September 25 letter was to do just that -- propose a resolution. You and I have spoken concerning my clients' proposed resolution, and I am confident that you have conveyed the substance of our discussion to your client. I hope and expect to hear from you promptly regarding QVC's response.

September 27, 2006
Page - 2 -

    With respect to your concern that Ms. Blinkoff's letter was some kind of signal that our clients are engaging in activity that violates the parties' contract, please be assured that they are not engaging in any such activity. While my clients are puzzled by QVC's apparent lack of interest in promoting the Models Prefer product line, they are interested at this point in working with QVC, in good faith, to arrive at a sensible and fair adjustment of the parties' relationship. I see no basis for immediate judicial intervention and trust that you agree that we should devote our efforts to determining whether an amicable resolution is possible. If, after a reasonable period of time, it appears that the parties are unable to reach a resolution, we both will have an opportunity to seek relief in court.

    Like Ms. Blinkoff's letter, this letter is subject to the protections of FRE 408. I look forward to hearing from you.

Best regards,

Antoinette R. Stone

ARS/
cc: Sharon Blinkoff, Esquire